**Marilyn WILCOX, Plaintiff,**

v.

**STRATTON LUMBER, INC., Defendant.**

**Civ. No. 95–0039–B.**

United States District Court,
D. Maine.

March 27, 1996.

Curtis Webber, Rebecca Webber, Linnell, Choate & Webber, Auburn, Maine, for plaintiff.

Robert W. Kline, Portland, Maine, for defendant.

## ORDER

BRODY, District Judge.

Plaintiff, Marilyn Wilcox, brought this sexual harassment and sexual discrimination suit against Defendant, Stratton Lumber Co., Inc. ("Stratton"). On November 29, 1995, a jury returned a verdict for Plaintiff on her hostile work environment and constructive discharge claims, and for Defendant on Plaintiff's failure to promote claim. The jury awarded $115,000 in compensatory damages and $75,000 in punitive damages. Plaintiff now seeks back pay, front pay and attorney's fees. *See* 42 U.S.C. § 2000e–5(g). Plaintiff also seeks civil penal damages under the Maine Human Rights Act ("MHRA"). *See* 5 M.R.S.A. § 4613(2)(B)(7).

### I. Allocation of Compensatory and Punitive Damages

The Parties agree that Defendant employed between 14 and 101 employees during the relevant time period, and, therefore, that the statute limits the total compensatory and punitive damages recovery to $50,000. 42 U.S.C. § 1981a(b)(3)(A); *Hogan v. Bangor and Aroostook Railroad Co.,* 61 F.3d 1034, 1037 (1st Cir.1995). At the charge conference, and over Defendant's objection, the Court instructed the jury on compensatory damages as well as punitive damages. Defendant objected to the instruction, and argued that the jury should have been instructed solely on punitive damages. Since punitive damages are not recoverable in the absence of a compensatory or nominal award, this would have resulted, in effect, in a directed verdict for Defendant. *See Kerr–Selgas v. American Airlines, Inc.,* 69 F.3d 1205, 1215 (1st Cir.1995). Plaintiff now requests either $50,000 in punitive damages, or, alternatively, $1 in nominal damages and $49,999 in punitive damages.

In *Hogan v. Bangor and Aroostook Railroad Co.,* the jury returned a verdict of $200,000 in compensatory and $200,000 in punitive damages, under a relevant cap of $200,000 total damages. 61 F.3d 1034, 1037 (1st Cir.1995). The lower court reduced each award by $100,000 in order to arrive at a final award of $200,000. *Id.* The First Circuit exercised its discretion under 28 U.S.C. § 2106 to vacate the punitive damages award, and instead awarded $200,000 in compensatory damages.[1] *Id.* The First Circuit reasoned that sufficient evidence supported compensatory damages, and it could avoid reaching the issue of punitive damages by allocating the entire statutorily authorized amount to compensatory damages. *Id.*

While this Court lacks the discretion § 2106 provides to appellate courts, the *Hogan* Court's reasoning guides the allocation of damages under the $50,000 cap in this case. By filling out the cap with compensatory damages and vacating any punitive award, the First Circuit avoided dealing with substantive issues surrounding the award of punitive damages. *Hogan,* 61 F.3d at 1037. The First Circuit chose to provide purely compensatory damages in order to best preserve the jury's award. *See id.* The Parties in this case agreed on a punitive damages instruction, but ultimately disagreed on whether Plaintiff could seek compensatory damages from the jury. Applying the reasoning of *Hogan* to this case, the Court can best preserve the jury's award by awarding Plaintiff $1 in nominal damages, as requested, and $49,999 in punitive damages. *See* 61 F.3d at 1037; *see also Kerr–Selgas,* 69 F.3d at 1215 (punitive damages awards require underlying compensatory or nominal damages awards). Accordingly, the Court awards Plaintiff $1 in nominal damages, as requested, and $49,999 in punitive damages.

### II. Equitable Relief

42 U.S.C. § 2000e–5(g)(1) provides for equitable relief for victims of discrimination,

---

1. 28 U.S.C. § 2106 provides that:
   [t]he Supreme Court or any other court of appellate jurisdiction may modify, vacate, set aside or reverse any judgment, decree or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

including "reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate," upon a finding that the defendant unlawfully discriminated against the plaintiff. In light of the evidence presented at trial and the jury verdict, the Court readily concludes that Defendant engaged in unlawful discrimination against Plaintiff. Plaintiff seeks equitable relief in the form of back and front pay. Plaintiff also seeks civil penal damages under the MHRA. *See* 5 M.R.S.A. § 4613.

### A. Back Pay

■ Title VII permits an award of back pay for the period beginning two years before the date of the filing of Plaintiff's complaint up to the date of judgment. 42 U.S.C. § 2000e–5(g)(1); *Scarfo v. Cabletron Systems, Inc.*, 54 F.3d 931, 954 (1st Cir.1995). The jury found that Defendant unlawfully discriminated against Plaintiff through a hostile work environment that resulted in Plaintiff's constructive discharge, but that Defendant did not discriminate against Plaintiff by failing to promote her. From that verdict the Court concludes that Plaintiff should receive back pay only from the period between the constructive discharge and the judgment. Defendant contends that the Court should reduce any back pay award because Plaintiff failed to mitigate her damages, and because Plaintiff received unemployment benefits during the back pay period.

### 1. Mitigation

■ According to Title VII, "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g)(1). In other words, a Title VII plaintiff must mitigate her back pay damages. *Id.* The employer, however, bears the burden of proof on the issue of mitigation. *Booker v. Taylor Milk Company, Inc.*, 64 F.3d 860, 864 (3d Cir.1995). Defendant argues that Plaintiff failed to mitigate her damages by (1) failing to seek alternative employment after she left Stratton, and (2) failing to accept Defendant's uncondi-

tional offer of reinstatement. The Court disagrees.

At trial Plaintiff testified that after leaving Stratton she "went everywhere" in search of employment. (Tr., Vol. II at 245.) Plaintiff testified that she applied for positions as a heavy equipment operator, waitress, and that she applied at hardware stores, convenience stores, gas stations and retail lumber yards for clerk positions. Plaintiff testified that she had no success until the winter of 1993–94, when she secured employment in the nursery at Saddleback Mountain. Plaintiff further testified that in 1994 she performed nursery work, waitressing and cleaning, and in fact, took "about every job I could find." (Tr., Vol. II at 301.) Plaintiff testified that in 1995 she held cleaning jobs, waitressing jobs, and a cashier/bakery position at an I.G.A. grocery. Plaintiff worked "most days" from 8:00 A.M. until 11:00 P.M. (Tr., Vol. II at 304.) In other words, Plaintiff promptly began an employment search, and in fact, was not unemployed for a significant period of time. Plaintiff also did not limit her employment search to comparably paying positions, but accepted positions at significantly lower wages.

■ The evidence clearly reflects Plaintiff's effort to find similar and lower paying employment for the remainder of 1993, and her acceptance of lower paying employment beginning in 1994. *See Denton v. Boilermakers Local*, 673 F.Supp. 37, 45 n. 2 (D.Mass.1987) (after extended period of searching, plaintiff must consider taking lower paying position). Defendant did not rebut any of Plaintiff's testimony on this issue. Defendant has failed to sustain its burden of proof that Plaintiff failed to seek alternative employment, and, therefore, failed to mitigate her back pay damages. *See Taylor Milk*, 64 F.3d at 864.

In mid–March, 1994, Defendant made Plaintiff an unconditional offer of reinstatement. Defendant contends that such offers toll the accrual of back pay liability, and asserts that Plaintiff should receive no back pay from the date of the unconditional offer forward. The Court disagrees.

In *Ford Motor Co. v. Equal Employment Opportunity Commission,* the United States Supreme Court indicated that absent special circumstances, an employer's unconditional offer of reinstatement tolls the accrual of back pay liability. 458 U.S. 219, 238–39, 102 S.Ct. 3057, 3069–70, 73 L.Ed.2d 721 (1982). The Supreme Court left to the trial court's discretion the determination of when exceptional circumstances merit circumvention of the rule. *Id.* at 238 n. 27, 102 S.Ct. at 3069 n. 27. Although the First Circuit has not yet examined what circumstances merit circumvention of the *Ford Motor Co.* rule, several courts have. *See, e.g., Smith v. World Insurance Co.,* 38 F.3d 1456, 1464 (8th Cir.1994); *Pierce v. F.R. Tripler & Co.,* 955 F.2d 820, 830 (2d Cir.1992); *Naylor v. Georgia–Pacific Corp.,* 875 F.Supp. 564, 581–82 (N.D.Iowa 1995). The Eighth Circuit, for example, has indicated that where an employee reasonably rejects an offer of reinstatement, the offer does not terminate the accrual of back pay damages. *Smith,* 38 F.3d at 1463; *see also Pierce,* 955 F.2d at 830 (ultimate issue in mitigation is whether the plaintiff acted reasonably in rejecting proffered employment). In a hostile work environment case, the Northern District of Iowa recently indicated that a reasonable concern of continued harassment may constitute an exception to the *Ford Motor Co.* Rule. *Naylor,* 875 F.Supp. at 582.

■ Plaintiff testified that at the time of Defendant's offer of reinstatement, she had doubts that the work environment at Stratton had changed, and that she would not have felt comfortable working at Stratton. Defendant failed to impeach this evidence. The Court is satisfied that Plaintiff feared continued harassment, and therefore, reasonably declined Defendant's offer of reinstatement. *See Naylor,* 875 F.Supp. at 582 (fear of continued harassment may constitute exception to *Ford Motor Co.* Rule). Accordingly, Defendant's offer of reinstatement did not toll the accrual of back pay liability in this case.

**2. Unemployment Benefits**

Plaintiff received unemployment benefits of $4,416 in 1993, and $4,281 in 1994. Defendant contends that the Court must reduce any back pay award by the amount of unemployment benefits Plaintiff received.

■ Traditionally, the collateral source rule prevents a court from reducing damages awards by benefits received by the plaintiff collateral to the defendant. *Lussier v. Runyon,* 50 F.3d 1103, 1107 (1st Cir.1995). While no circuit has determined that unemployment benefits should, as a general rule, be deducted from back pay awards in discrimination cases, the circuits have split over whether to prohibit the deduction of unemployment benefits or to leave the decision to the district court's discretion. *Gaworski v. ITT Commercial Finance Corp.,* 17 F.3d 1104, 1113 (8th Cir.) (citing cases); *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994). The First Circuit has not yet directly examined the issue. In *Lussier,* however, the First Circuit indicated a tendency to agree with those circuits that have left the issue of unemployment benefits to the discretion of the district court. 50 F.3d at 1109.

■ The Court concludes that it has discretion to deduct unemployment benefits, and exercises that discretion in this case. The Court recognizes that in addition to making the aggrieved party whole, back pay awards serve to deter future discrimination. *Gaworski,* 17 F.3d at 1113 (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975)). In this case, however, the size of the back pay award, even after the deduction of Plaintiff's unemployment compensation, will adequately deter Defendant from future discrimination. Refusing to deduct Plaintiff's unemployment benefits would have at best a marginal additional deterrent effect. The Court is satisfied that a back pay award downwardly adjusted for unemployment benefits received will make Plaintiff whole, and will also serve a deterrent purpose. The Court will subtract those benefits from Plaintiff's back pay award.[2]

---

**2.** For similar reasons the Court declines to award Plaintiff prejudgment interest on her back pay award. Awards of prejudgment interest are left to the discretion of the district court. *Scarfo,*

### 3. Total Back Pay Award

Defendant does not dispute Plaintiff's calculation of the back pay award, including raises Defendant offered in 1994 and 1995, which Plaintiff has appropriately reduced by the amount of income she earned in other employment in those years. Accordingly, the Court makes the following back pay award: $13,200 (1993) + $21,025 (1994) + $15,682 (1995), for a subtotal of $49,907. From this, the Court subtracts $4,416 Plaintiff received in unemployment compensation in 1993 and $4,281 Plaintiff received in unemployment compensation in 1994. The Court awards Plaintiff total back pay in the amount of $41,210.

### B. Front Pay

When reinstatement is infeasible or impossible, district courts have discretion to award successful Title VII plaintiffs front pay from the date of judgment forward. *Scarfo*, 54 F.3d at 954; *Lussier*, 50 F.3d at 1107–08. Statutes such as Title VII, however, "afford trial courts wide latitude to award or withhold front pay according to established principles of equity and the idiocratic circumstances of each case." *Lussier*, 50 F.3d at 1108. The burden falls on Plaintiff to prove the amount, if any, of a front pay award. *Hansel v. Public Service Co. of Colorado*, 778 F.Supp. 1126, 1136 (D.Colo.1991). Defendant contends that Plaintiff has failed to meet her burden.

Plaintiff testified that she would have continued working at Stratton until the year 2006, at which point she would have worked 25 years, and she and her husband would have paid their mortgage. Thus, Plaintiff requests a front pay award of approximately $178,000, based on her projected earnings over the next ten years. The Court is persuaded, however, that the record does not support any front pay award, let alone such a generous amount over such a lengthy period. *See Eldred v. Consolidated Freightways Corp. of Delaware*, 907 F.Supp. 26, 28 (D.Mass.1995) (lengthy period and speculative inquiry preclude award of front pay).

Plaintiff testified that she had very limited prospects of finding similar paying full time employment. Defendant objected to the speculative nature of Plaintiff's testimony. The Court noted that Plaintiff's testimony was based purely on her own personal experience, and that it was not supported by expert testimony. (Tr., Vol. II at 305.) Indeed, Plaintiff offered no expert testimony or evidence on the economy of the Rangeley–Stratton region, or employment availability. *See Scarfo*, 54 F.3d at 955 (front pay award based on expert testimony).

In addition, the circumstances of this case weigh against an award of front pay. *See Lussier*, 50 F.3d at 1108 (trial court must base front pay on circumstances of each case). Plaintiff, at 37, is not too old to seek and begin new employment. Furthermore, Stratton is a small employer with limited income, and has not been profitable during the last two years. The Court is not convinced that Stratton will exist for another ten years.

In sum, Plaintiff has not minimally met her burden of proof on front pay. *See Hansel*, 778 F.Supp. at 1136 (plaintiff bears burden to establish front pay). Plaintiff has neither supported her request with sufficient evidence, nor do the circumstances of the case counsel in favor of such a speculative award. Accordingly, the Court exercises its discretion to deny Plaintiff's request for front pay, and concludes that her generous back pay award suffices to make her whole. *See Eldred*, 907 F.Supp. at 28 (award of back pay alone makes plaintiff whole and fairly considers interests of both parties).

### C. 401(k) Benefits

Finally, Plaintiff seeks lost 401(k) contributions as part of her back and front pay awards. The First Circuit has left to district court discretion the determination of whether making the plaintiff whole requires an award of lost fringe benefits. *Earnhardt v. Commonwealth of Puerto Rico*, 744 F.2d 1, 3 (1st Cir.1984). The Court is satisfied that

54 F.3d at 961; *Hogan*, 61 F.3d at 1038. Plaintiff will receive a very significant back pay award, and the Court is satisfied that the award

will serve its purpose without prejudgment interest.

Plaintiff's back pay award is adequate, and determines that both lost and future 401(k) benefits depend too heavily on speculation for the Court to award them.

Plaintiff bases her calculation of lost 401(k) benefits on her contribution to the plan in 1992. Plaintiff asserts that it is reasonable to assume that her contribution would have continued at the 1992 levels. The Court disagrees. As Defendant points out, Plaintiff contributed voluntarily. While Plaintiff may have desired to continue contributing had she continued her employment at Stratton, any number of contingencies may have prevented her from continuing to do so. The speculative nature Plaintiff's request significantly increases the risk that an award for lost 401(k) benefits will serve as a windfall to Plaintiff rather than to make her whole.

Plaintiff argues that a past pattern of employer contributions can support a forecast of an employer's continued contributions. *See Gaworski*, 17 F.3d at 1111. The evidence, however, does not establish such a past pattern. Plaintiff concedes that Defendant did not institute a 401(k) plan until November of 1992. The recent institution of the plan precludes Plaintiff from demonstrating an established pattern of employer contributions. Moreover, as indicated, Stratton's financial status raises significant question as to whether it can or will continue to make 401(k) contributions in the future. The Court declines to adjust Plaintiff's back pay award to account for potentially lost 401(k) benefits.

### D. Civil Penal Damages under the MHRA

■ Upon finding that a defendant violated the MHRA, a court may award a plaintiff any equitable relief it deems appropriate, including up to $10,000 in civil penal damages. 5 M.R.S.A. § 4613(2)(B)(7). Based on the evidence adduced during trial, the Court concludes that Defendant's conduct violated the MHRA. The Court also has concluded,

however, that the back pay award, in conjunction with damages awarded by the jury suffice to make Plaintiff whole and to deter Defendant from engaging in similar conduct in the future. The Court concludes that an award of $1,000 in civil penal damages acknowledges Defendant's violation of the MHRA, and will deter Defendant from further violations. The Court makes this award in the context of the other equitable relief provided to Plaintiff through Title VII, and concludes that any more would result in excessive relief to Plaintiff.

### E. Equitable Relief Summary

In sum, the Court orders back pay in the amount of $41,210 and civil penal damages pursuant to 5 M.R.S.A. § 4613(2)(B)(7) in the amount of $1,000. The Court orders Defendant to remit to Plaintiff total equitable relief in the amount of $42,210.

### III. Attorney's Fees

■ 42 U.S.C. § 2000e–5(k) provides that the court, in its discretion, may award the prevailing party reasonable attorney's fees, including expert witness fees. The determination of a reasonable attorney's fee award, if any, resides within the broad discretion of the district court. *Scarfo*, 54 F.3d at 963–64. District courts employ the "Lodestar" method for calculating attorney's fee awards. *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir.1992). Under that approach, the Court multiplies the number of hours "productively expended by counsel" by a reasonable hourly rate. *Id.* at 937. This calculation, of course, requires the Court to determine both the number of hours productively spent and a reasonable hourly rate. *See id.* The Court is satisfied that the rates at which Attorneys Curtis and Rebecca Webber seek reimbursement are reasonable.[3] The Court, however, finds the number of hours spent inordinate, if not excessive, and will reduce the requested number of hours prior to making the Lodestar calcu-

---

**3.** The Court disagrees with Defendant's characterization of Attorney Rebecca Webber's $110 per hour billing rate as excessive. Plaintiff's counsel submitted their own affidavits, as well as an affidavit from another attorney familiar with billing rates for this type of case in this area in support of their requested billing rates. Defendant's unsupported assertions to the contrary are not persuasive.

The Court is also satisfied that the rates of John Linnell, Michelle Small and Deborah Tardif are reasonable.

lation. *Lipsett*, 975 F.2d at 937; *see Weinberger v. Great Northern Nekoosa Corp.*, 801 F.Supp. 804, 811–12 (D.Me.1992).

### A. Excessive Time

Plaintiff seeks reimbursement for a total of 1,568 hours. Based on the billing records filed in support of Plaintiff's attorney's fees request, it appears that both Curtis and Rebecca Webber worked almost exclusively on this case for its duration. The total amount of time Plaintiff's counsel devoted to this case appears exorbitant for a case of this nature, and a close examination of the billing records underscores this conclusion. In arriving at what the Court determines is a reasonable number of hours, the Court emphasizes that it does not question that the Webbers generally spent the time their billing records reflect. They spent an inordinate amount of time, however, going down blind alleys, raising inappropriate legal issues during discovery and over reacting to non-issues generated by Defendant. In so doing, Plaintiff's counsel spent far more time on peripheral and irrelevant issues than the Court in good conscience can assess as attorney's fees against Defendant.

■ Initial examination of the billing records reveals two very strong indicators of excessive or unreasonable billing. First, at least two days reflect a nearly impossible number of hours billed. On April 23, 1995, Curtis Webber billed nearly 19 hours preparing for a deposition, and on October 20, 1995, he billed 24 hours on various tasks. Second, the records are liberally peppered with entries for "legal research" and "review file." In many cases, the billing record lumps "review file" or "legal research" among several tasks in a large block of time, making it virtually impossible for the Court to determine how much time the attorney spent reviewing the file, or for what reason. These vague entries defy Court evaluation. *See Weinberger*, 801 F.Supp. at 816, 819 (inadequate documentation and document review subject to reduction).

■ Closer examination of the billing records reveals that either Curtis or Rebecca Webber inevitably spent significantly more time on individual tasks than merited. The Court will provide a few specific examples out of many to illustrate the point. Between January 5 and 6, 1994, Curtis Webber billed over twenty one hours in preparation for a fact finding conference. On February 2, 1995, Rebecca Webber billed over three and a half hours, primarily to devise a discovery plan. On May 19, 1995, Rebecca billed nearly seven hours drafting a memorandum on the discrete issue of the release of Plaintiff's marriage counseling records to Defendant. Over the next few days, one or the other attorney devoted several more hours to the memorandum. Between August 8 and 14, 1995, both attorneys spent approximately 35 hours preparing their response to Defendant's Motion for Summary Judgment. Between August 26 and 27, 1995, Curtis Webber billed between 10 and 17 hours for work on his pretrial memorandum. On August 31, 1995, Rebecca Webber billed over seven hours researching Rule 803 of the Federal Rules of Evidence, and drafting an in limine motion. These are just examples of what the Court views generally as an excessive amount of time spent on discrete tasks in this case.

■ The records also reflect duplicative efforts on the part of Curtis and Rebecca Webber, which resulted in duplicative billing. Generally, an excessive amount of time has been billed for co-counsel conferences. *See Weinberger*, 801 F.Supp. at 819 (co-counsel conferences subject to reduction). In addition the Court can identify numerous occasions upon which both attorneys billed for work that could and should have been done by only one. On March 23, 1995, for example, Rebecca Webber billed over three hours for attending Plaintiff's deposition solely "to observe her ability to respond to cross examination." On April 11, 1995, each attorney billed 12 hours for travel to Rangeley to tour the Stratton facility, take pictures, and take or attend two depositions. On October 24, 1995, each of Plaintiff's attorneys billed between 11 and 13 hours a piece for travel to Bangor for jury selection. The Court declines to reimburse two attorneys for the work of one.

■ The billing records also reflect far too much time spent in preparation for depositions. *See Weinberger*, 801 F.Supp. at 820–21 (excessive deposition time subject to reduction). Between March 19 and 20, Rebecca Webber spent over 10 hours preparing for and taking Plaintiffs mock deposition, and a third attorney at the Webbers' firm spent three and a half hours preparing for and conducting the mock deposition. As indicated, Curtis Webber billed 19 hours on April 23, 1995 preparing for the deposition of Guy Brochu. Between August 5 and 6, 1995, Curtis Webber spent over 10 hours reviewing and preparing for the deposition of Gary Wilcox. Between April 4 and 10, 1995, Rebecca Webber spent over 10 hours preparing for the deposition of Gerry Galusha. The Court concludes that Defendant should not be fully billed for such extravagant preparation costs. Counsel are entitled to prepare their case as thoroughly and completely as they feel necessary and the Court will not second guess their efforts in that regard. The Court, however, is uncomfortable assessing attorney's fees on Defendant for the luxury of what the Court concludes to be over preparation.

■ From the records the Court also concludes that the Webbers spent an inordinate amount of time in needless consultation with or preparation of their expert, Dr. Waxman. Either Curtis or Rebecca Webber spoke or wrote to Dr. Waxman on virtually a daily basis (Dr. Waxman's name appears in every entry on Page 13 of the billing records, for example). In light of Dr. Waxman's testimony at trial and limited impact on the case, the Court is not satisfied that such time in all instances was appropriate and should be billed to Defendant.

■ The billing records also reflect an alarmingly high number of hours spent in non-productive conferences or disputes with opposing counsel on collateral or tangential issues. On April 19, 1995, for example, Curtis Webber billed nearly six hours preparing his opposition to a Motion to Quash a Subpoena. Part of the nearly five hours Rebecca Webber billed to the case on July 19, 1995 involved a telephone conference with opposing counsel regarding whether or not the word "yesterday" was inserted into a letter. The Court in this case was inundated with Motions in Limine, most of which reflected the animosity between counsel rather than serious legal issues or relevance. Many of the Webbers' billing entries account for scheduling problems or disputes, or telephone conferences with the Magistrate on issues the Parties should have been able to resolve amicably on their own. The number of discovery related docket entries in this case outstrips any seen by this Court in recent memory. The incivility was caused as much if not more by Defendant's counsel, but the Court is not willing to use attorney's fees as punishment for frivolous squabbling.

The Webbers also seek reimbursement for all of the time they spent at trial. The Court, however, is not satisfied that trial required the presence of both attorneys at all times, and the billing records support this concern. On November 8, 1995, for example, both attorneys billed over thirty hours in the aggregate for the first day of trial, at which Curtis Webber made his opening statement. From that point forward, both attorneys billed full days of trial time even though they may not have examined any witnesses or in any other way participated in the proceedings. The Court does not mean to question the Webbers' trial strategy, which apparently required the constant presence of two attorneys at trial. The Court does not find, however, that the presence of both was necessary, and to that extent, that Defendant should bear the full cost of this strategy.

■ The Webbers also seek to bill an excessive amount of paralegal time for unnecessary effort. *See Weinberger*, 801 F.Supp. at 823 (paralegal time subject to reduction). The Court does not mean to imply that judicious use of paralegals should not be encouraged. Indeed, such use of paralegals may ultimately contribute to lower and more reasonable billing. The Court, however, is not willing to sanction injudicious billing of paralegal time. On August 15, 1995, for example, a paralegal billed over four hours for a trip to Bangor to deliver documents. On October 3, 1995, a paralegal billed six hours for a trip to Bangor to review jury questionnaires. On October 26, 1995, a

paralegal billed over five hours, again for traveling to Bangor to hand deliver documents, review jury questionnaires, ask about court closure for Veteran's Day, and make hotel reservations. The Court finds this time excessive and unnecessary. Through proper planning, the Webbers could have employed more cost effective ways of filing their documents and making inquiries and reservations, such as the mail and telephone.

■ In short, vague descriptions or excessive time permeate nearly every billing entry. In examining an attorney's fee request the Court must determine whether counsel exercised sound billing judgment. *Inmates of Maine State Prison v. Zitnay,* 590 F.Supp. 979, 985 (D.Me.1984). The Court concludes that in numerous instances, Plaintiff's billing records reflect a serious lapse in billing judgment related to legal preparation and representation in this matter.

### B.  Unsuccessful Claims

The jury's verdict establishes that Plaintiff prevailed on her Title VII and MHRA claims. In addition to those claims, however, Plaintiff brought common law assault and battery and negligence claims, and named Guy Brochu as a second defendant. By the end of trial, the Court had dismissed both of Plaintiff's common law claims, and Guy Brochu as a defendant. Defendant seeks a reduction in the fee award based on Plaintiff's unsuccessful claims. Plaintiff contends that although she was unsuccessful on some claims, those allegations were related to the claims upon which Plaintiff prevailed, and thus, do not merit a reduction in her fee award.

■ Upon determining that a party has prevailed on a claim that provides for fee shifting, a court must then determine whether the claims on which the party lost were unrelated to the successful claims, or whether they derived from a common core of facts or related legal theories. *Lipsett,* 975 F.2d at 940 (quoting *Hensley v. Eckerhart,* 461

U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983)). As with other aspects of fee award determinations, district courts retain broad deference in determining the relatedness of claims. *Id.* Moreover, a close relationship between claims does not necessarily preclude district courts from reducing the total number of hours billed to account for the unsuccessful claims. Where the successful and unsuccessful claims are closely related, the district court may either identify specific hours that should be eliminated, or simply reduce the award to account for the limited success. *Phetosomphone v. Allison Reed Group, Inc.,* 984 F.2d 4, 7 (1st Cir.1993) (quoting *Hensley,* 461 U.S. at 436–37, 103 S.Ct. at 1941). Bearing that in mind, the Court turns to the claims upon which Plaintiff did not prevail.

The Court dismissed Plaintiff's common law assault and battery and negligence claims. The Court determined that Maine's statute of limitations time-barred Plaintiff's assault and battery claim. That claim, therefore, required an analysis of the statute of limitations, a legal issue entirely distinct from the statutory discrimination claims. The Court dismissed the negligence claim primarily on the grounds that the immunity provisions of the Maine Workers Compensation Act bar tort suits against employers. Throughout the course of the case, the negligence claim depended on and ultimately was defeated on the basis of state tort principles, including whether a tort duty supported the claim, and whether workers compensation immunity barred the claim.[4] In a broad sense, both of the common law claims derived from the same core of facts as the discrimination claims, inasmuch as the entire suit derived from a series of events that occurred over an eleven year period. The common law claims, however, did not involve legal theories so related as to be inextricable from the statutory discrimination claims.

■ The Court recognizes that Plaintiff did ultimately succeed at trial, and that the statutory discrimination claims constituted the primary thrust of her suit. Moreover,

---

**4.** The Court did consider whether the statutory discrimination claims subsumed the negligence claim. The bulk of legal analysis on the negli-

gence claim, however, revolved around the theory of negligence.

the billing records generally do not allow for identification and subtraction of hours spent solely on the lost claims. Accordingly, the Court will further reduce the number of hours of Curtis and Rebecca Webber to recognize Plaintiff's ultimate success at trial, but also to account for time spent on claims that did not similarly prevail. *See Phetosomphone,* 984 F.2d at 7.

### C. Lodestar Calculation

Curtis Webber seeks reimbursement for approximately 830 hours (including the additional request submitted at oral argument), Rebecca Webber for approximately 698 hours (including the additional request submitted at oral argument), John Linnell, Esq. for approximately 10 hours, Deborah Tardif for approximately 34 hours and Michelle Small, Esq. for approximately 5 hours. As indicated, the Court has found that Curtis and Rebecca Webber, as well as Deborah Tardif billed an excessive amount of time. The Court must base the Lodestar calculation on a reasonable number of hours expended. *Lipsett,* 975 F.2d at 937. The Court determines the following to be the reasonable number of hours for this case: Curtis Webber, 390 hours; Rebecca Webber, 325 hours; Deborah Tardif, 20 hours; John Linnell, 10 hours and Michelle Small 5 hours. The Lodestar calculation results in the following award of attorney's fees: Curtis Webber, $54,600; Rebecca Webber, $35,750; Deborah Tardif, $1200; John Linnell, $1350, Michelle Small, $550, for a total award of $93,450. The Court sees *no need for further* upward or downward adjustment.

### D. Expert Witness Fees

██ Prevailing parties in Title VII actions may also recover reasonable expert fees. 42 U.S.C. § 2000e–5(k). Plaintiff seeks reimbursement for her expert, Dr. Harvey Waxman, in the amount of $20,-204.92. Reimbursement for expert fees is a relatively recent addition to § 2000e–5(k), and as such very little authority guides the Court in arriving at an expert fee award. *See, e.g., Kerr–Selgas v. American Airlines, Inc.,* 1994 WL 528068, at *6 (D.P.R.1994). By including the word "reasonable," the stat-

ute itself may provide the best guidance. 42 U.S.C. § 2000e–5(k). The Court determines that Dr. Waxman's fee request is excessive, and must be reduced to a reasonable level.

The Court notes that Plaintiff's bill of costs, which includes payments to Dr. Waxman, lacks anything approaching the specificity and detail that would allow the Court to engage in serious review. On five separate occasions, Plaintiff's counsel paid Dr. Waxman between $1800 and $4500 either for "services rendered," for "professional services," for "services," or for no stated reason at all. On December 5, 1995, Plaintiff's counsel paid Dr. Waxman $5,341 for a variety of tasks, one of which includes a trip to Bangor at which he could not testify due to counsel's poor witness management. The First Circuit requires counsel seeking attorney's fees to submit a full and specific accounting of the tasks performed, the dates of performance and the number of hours spent on each task. *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 527 (1st Cir.1991). In the context of attorney's fees, the First Circuit has indicated that the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award, or, in egregious cases, disallowance. *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984). The same reasoning applies to expert witnesses. In the absence of a detailed accounting, the Court cannot determine the reasonableness of the hours spent on any given task, or the fees charged for those tasks.

In addition, the Court is not persuaded that Dr. Waxman had the kind of impact on the case necessary to support such a high fee. Indeed, at voir dire, the Court indicated that the decision to allow him to testify as an expert was a close one. The Court concludes that Dr. Waxman ultimately had a minor impact on the case.

Finally, Plaintiff's excessive use of Dr. Waxman points to the lapse of billing judgment for which the Court has significantly reduced Plaintiff's attorney's fee request. The statute, 42 U.S.C. §§ 1981a and 2000e–5(k), limited Defendant's exposure in this case to $50,000 plus any equitable relief the

Court might grant. Plaintiff seeks well over $200,000 in total fees and costs, $20,000 of which are attributable to Dr. Waxman. The Court concludes that incurring expert fees in the amount of $20,000 for Dr. Waxman in the context of this case simply was unreasonable.

Accordingly, the Court concludes that $6,000 represents a generous fee for Dr. Waxman's participation in the case. The inadequate detail of the billing records makes any evaluation of Dr. Waxman's hours impossible. $6,000, however, at his reasonable rate of $175 per hour, would compensate him for approximately 34 hours. The Court is satisfied that Dr. Waxman could reasonably prepare, travel and testify in 34 hours.

### E. Costs

Costs will be assessed in the usual manner by the Clerk of the Court.

### F. Out of Pocket Expenses

Plaintiff seeks out-of-pocket costs in the amount of $24,031.42. Although the First Circuit has not yet directly faced this issue, the majority of authority supports the proposition that a reasonable attorney's fee under 42 U.S.C. § 2000e–5(k) includes out-of-pocket expenses of the type an attorney would normally pass on to a client. *See Mennor v. Fort Hood National Bank*, 829 F.2d 553, 557 (5th Cir.1987); *cf. Palmigiano v. Garrahy*, 707 F.2d 636, 637 (1st Cir.1983) (construing § 1988 to include out-of-pocket expenses).

Plaintiff has not submitted an appropriate statement of out-of-pocket expenses. Instead, Plaintiff has provided the Court with one comprehensive statement that includes expenditures attributable to other categories, such as costs and expert witnesses. Moreover, Plaintiff's memorandum requests out-of-pocket expenses in the amount of $24,031.42, but the supporting documentation does not guide the Court as to how Plaintiff arrives at that figure. It is not incumbent upon the Court to comb through the jumble of expenses Plaintiff has submitted with her request, and from the supporting documentation the Court can neither confirm the accuracy of Plaintiff's $24,031.42 request, nor make a reasonable determination of what actual out-of-pocket expenses Plaintiff has incurred.

 Accordingly, the Court reduces Plaintiff's request for out-of-pocket expenses to the amount of $5,000. The Court determines that $5,000 adequately reimburses Plaintiff's counsel for their travel, food and lodging expenses, and other reasonable out-of-pocket expenses incurred over the course of this case.

### Conclusion

The Court orders Defendant to make the following payments to Plaintiff:

| | | |
|---|---|---|
| (1) | Nominal Damages: | $1 |
| (2) | Punitive Damages: | $49,999 |
| (3) | Back Pay: | $41,210 |
| (4) | MHRA Civil Penal Damages: | $1,000 |
| (5) | Attorney's Fees: | $93,450 |
| (6) | Expert Witness Fees: | $6,000 |
| (7) | Out of Pocket Expenses: | $5,000 |

The Court orders Defendant to remit to Plaintiff a total award of $196,660.

*SO ORDERED.*