Gary S. WEBBER, Plaintiff

v.

INTERNATIONAL PAPER
COMPANY, Defendant

No. CIV.02–63–B–S.

United States District Court,
D. Maine.

Feb. 26, 2004.

Arthur J. Greif, Gilbert & Greif, P.A., Bangor, ME, for Gary S Webber.

Jonathan P. Harmon, McGuire, Woods, Richmond, VA, Kate S. Debevoise, Bernstein, Shur, Sawyer, & Nelson, Portland, ME, Peter M. Weatherbee, Weatherbee and Burlock, Bangor, ME, Vincent J. Miraglia, McGuire Woods LLP, Washington, DC, for International Paper Company.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGAL, Chief Judge.

Plaintiff Gary Webber sued International Paper Company ("IP") under the Maine Human Rights Act, 5 M.R.S.A. § 4551 et seq. ("MHRA"), alleging that his dismissal as part of a company-wide reduction in force was motivated by his disability. The action was removed to federal court based on diversity jurisdiction. At trial, the jury found for Mr. Webber, and awarded compensatory and punitive damages. Claims for front and back pay are now before the Court. Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following Findings of Fact and Conclusions of Law with regard to Mr. Webber's claims for front and back pay.

### I. FINDINGS OF FACT

**Background.** Gary Webber was born January 25, 1953; he is 51 years old as of the date of this opinion. Mr. Webber was employed at the Bucksport mill beginning in November of 1983. International Paper acquired the Bucksport mill in 2000. During his tenure at the mill, Mr. Webber worked in various positions; in the summer of 2001, Mr. Webber was employed as a project engineer. Mr. Webber testified that if he had not been terminated, he intended to work at the Bucksport mill until he reached the age of 65.

As of July 15, 2001, the date of his termination, Mr. Webber's annual salary was $59,143; he also received non-salary benefits including medical insurance, dental insurance, life insurance, and long-term disability insurance.[1]

---

1. As part of a separate workers' compensation action, the parties stipulated that in 1997, "a total of $10,695.00 per year was allocated to mill salaried employees to pay for fringe benefits." (Evid. Hr'g Pl.'s Ex. C.) While it is not clear whether employees were provided the same benefits in 1997 as they were in 2001, this sum includes the value of medical benefits and employer 401(k) plan contributions.

**History of Disability.** Mr. Webber has a history of problems with his knees, which impair his mobility and have required him to undergo several surgeries. While he was employed at the Bucksport mill, his knee surgeries and recuperation from surgery sometimes rendered him unable to report for work. During these periods, International Paper (or its predecessors) continued pay Mr. Webber his full salary, pursuant to the "salary continuance" short-term disability plan. (Evid. Hr'g Tr. at 26, Evid. Hr'g Def.'s Ex. DD.)

As of the evidentiary hearing on November 24, 2003, Mr. Webber was scheduled to undergo another knee surgery in January 2004, which he anticipated would require a three- to four-month recuperation period following the surgery, during which time he would not be able to report for work.

**Termination and Offer of Reinstatement.** On June 25, 2001, Mr. Webber was informed that his position was being eliminated as of July 15, 2001 as part of a company-wide reduction in force. His last regular salary payment occurred on July 15, 2001.

Shortly after being notified of his impending termination, Mr. Webber retained a lawyer. A complaint was filed with the Maine Human Rights Commission on August 10, 2001. David Libby, the Human Resources Manager at the Bucksport mill, telephoned Mr. Webber on September 25, 2001 to offer him the opportunity to return to work at the Bucksport mill in the position of "SQA Coordinator." The pay and benefits would have been the same as at his previous position as a Project Engineer, and the work was largely sedentary. Mr. Webber turned down the offer. Mr. Libby telephoned Mr. Webber at least once thereafter to re-extend the offer to him. Although Mr. Webber's immediate

supervisors would have been different from his immediate supervisors as a project engineer, correspondence from Mr. Webber's attorney to IP indicated that Mr. Webber did not wish to return to a position that would be "subject to the overall control of the Mill Manager and the Human Resources Manager, who were the two individuals who terminated Mr. Webber." (Trial Ex. D–20.) At trial, Mr. Webber explained that he turned down the position because:

> I was loyal to them all those years [and had filed a complaint with the Maine Human Rights Commission after my termination] and all of a sudden, a job that was opened up when they fired me is now available to me. I didn't feel that I could trust them. I figured I'd be there a short amount of time, and I'd be terminated again.

(Trial Tr. at 133–34.) On cross-examination, Mr. Webber acknowledged that his concern that he would be re-hired only to be terminated again was not based in fact and was purely speculative.

**Long–Term Disability Coverage.** In 2001, IP provided its employees with mandatory long-term disability insurance that would pay benefits equal to 60% of the worker's salary in the event of a qualified disability. The annual premiums paid by IP with respect to Mr. Webber's long-term disability insurance coverage totaled $507 in 2001. In 2001, Mr. Webber contributed an additional $126 annually to increase his long-term disability coverage so that in the event of disability, he would receive benefits equal to 70% of his salary.

International Paper's long-term disability insurance plan was self-insured: premiums paid by the company, together with any supplemental premiums paid by em-

---

At the time of his discharge, however, Mr. Webber was not participating in the 401(k) plan, and he continued to receive medical benefits while he was receiving long-term disability benefits.

ployees were deposited in an account from which disability benefits were paid by the third-party administrator, Wausau Benefits, Inc.

**Long–Term Disability Benefits.** On July 8, 2001, after he had been informed of his impending termination but before his regular salary had been discontinued, Mr. Webber applied for long-term disability benefits. On July 20, 2001, Mr. Webber was informed that his application for long-term disability benefits had been approved. Mr. Webber received long-term disability benefits from August of 2001 to October of 2003.

The long-term disability benefit was paid in monthly payments of $3,365.83. During the time that Mr. Webber received long-term disability benefits, he also continued to receive the medical benefits he had received during his regular employment at the mill. The dental benefits he and his family had received when he was an employee were discontinued. Under the provisions of the policy, if Mr. Webber obtained employment while receiving long-term disability benefits, his long-term disability benefits would be negatively affected.

**Job Search.** Mr. Webber described his job search following his dismissal from the Bucksport mill as follows:

> I have applied for a position at Jackson Lab, which was very similar to the position I held at the mill, Home Depot, the IGA in Trenton. I found a technical position job search called PJ Scout on the Internet, and I checked that. They send me updates for technical positions in the area. Most have been in New Jersey [and] New York, so they haven't qualified. I check the Bangor Daily News daily, especially on the weekends. I've checked the local papers—Ellsworth American, Bar Harbor Times. And there's one in—based out of Bangor, downtownme.com.

(Evid. Hr'g Tr. at 20–21.) Mr. Webber focused his job search on technical positions generally because he did not have an engineering degree.

Mr. Webber did not go to the unemployment office to check job listings. At the evidentiary hearing, Mr. Webber testified that he had completed a total of six applications for work from the date of his discharge to the date of the hearing, but could only remember three of them. He testified that these six positions were the only positions available that he "thought [he] could do with [his] restrictions." (Evid. Hr'g Tr. at 46.) The first application was for a job as facilities manager at the Jackson Laboratory, a position that required an engineering degree. Mr. Webber recognized that he was not qualified, but knew that the position had been open for two years, and thought perhaps he could be competitive without a degree. He also applied for employment at a local grocery store and at The Home Depot, despite the fact that there were no open positions with either employer at the time of his applications. Mr. Webber testified that he was unable to find a job that he believed he could perform with his limited mobility.

Mr. Webber testified that he applied for employment at the Jackson Laboratory and The Home Depot in the autumn of 2001, and could not remember whether he applied for employment at the grocery store in 2001 or in the spring of 2002.

**Recertification/retraining.** Although Mr. Webber had worked as an industrial arts teacher for almost eight years prior to his employment at the Bucksport mill, he did not seek employment in that field following his termination. Mr. Webber testified that he did not have a teaching certificate, and that he did not seek to obtain a teaching certificate after his termination. He indicated that he was "not too sure [he]

wanted to go back into teaching." (Evid. Hr'g Tr. at 48.) In order to obtain certification, Mr. Webber testified that he would need to complete between four and six classes at the University of Maine at Orono, and that it was difficult for him to drive from his home to the university to attend classes. Mr. Webber testified that he met with a counselor "about retraining or trying to find some other occupation that might be within my restrictions." (Evid. Hr'g Tr. at 47.) Apparently as a result of his consultation with the counselor, Mr. Webber took one course in horticulture or landscape design.

**Volunteer work.** Mr. Webber testified that he has served on the school board of the local school union for twelve years. In addition, following his termination from his position at the Bucksport mill, Mr. Webber developed a database to keep track of the chemicals used in the school building, a database similar to that used at the mill.

**Evidence of job opportunities/failure to mitigate.** At the hearing, IP asked Mr. Webber whether he knew of several employers in Mr. Webber's geographic area: St. Joseph's Hospital, University of Maine, Eastern Maine Medical Center, the Ellsworth hospital, and Husson College. IP did not establish that those employers had open positions or that Mr. Webber would have been eligible for any such positions, nor did it introduce any evidence as to the compensation that Mr. Webber could have earned had he pursued such positions with reasonable diligence.

**Current job availability at the Bucksport mill.** A subsequent reduction in force occurred at the Bucksport mill in the Fall of 2003, and two additional project engineer positions were eliminated. Each of the positions eliminated was occupied by an individual with a four-year engineering degree. Both of the project engineers whose positions were terminated are scheduled to continue working at the mill

until September of 2004. The SQA Coordinator position was not eliminated in the Fall 2003 reduction in force.

Although there are no open positions in the engineering department where Mr. Webber worked at the time of his termination, IP has stated that it prefers reinstatement to front pay and that it is willing create a position for Mr. Webber, should the Court determine that front pay or reinstatement is appropriate. Mr. Webber has indicated that he would consider accepting a position at IP, but noted that he will be unable to work for three to four months following his January 2004 knee surgery.

**Jury Verdict.** On October 10, 2003, the jury rendered a verdict in favor of Mr. Webber, and awarded compensatory damages of $1,000,000 and punitive damages of $2,000,000. The jury was also asked the following question: "Has International Paper proven by a preponderance of the evidence that Gary Webber should have accepted the offer of employment as SQA Coordinator on or after September 25, 2001?" The jury answered in the negative.

## II. CONCLUSIONS OF LAW

Based on the foregoing findings of fact, the Court makes the following conclusions of law:

1. The long-term disability benefits received by Mr. Webber constitute a collateral source and may not be deducted from an award of back pay under the MHRA.

2. The Court is bound by the jury's determination that IP did not prove by a preponderance of the evidence that Mr. Webber should have accepted the offer of employment as SQA Coordinator on or after September 25, 2001.

3. Mr. Webber removed himself from the labor market at the end of 2001

by failing to apply for any jobs after that time, and is not entitled to an award of back pay for subsequent periods of unemployment.

4. Mr. Webber is awarded back pay for the period between July 15, 2001 and December 31, 2001 in the amount of $27,384.02.

5. Reinstatement is not feasible in this case: Mr. Webber's position has been eliminated, there are no open positions at the mill, and the possibility of creating a position for Mr. Webber could potentially require significant judicial oversight.

6. Mr. Webber has been more than adequately compensated for his injury, and no front pay is awarded.

7. Maine statute imposes a cap on the sum of compensatory and punitive damages. The jury's awards of compensatory and punitive damages are reduced to $300,000 and $0, respectively.

8. Mr. Webber is not entitled to prejudgment interest on the jury award, but is awarded prejudgment interest of 8% on the award of back pay.

## III. DISCUSSION

### A. Back Pay

As concerns the issue of back pay to which Mr. Webber is entitled, the parties have presented two main issues. First, should an award of back pay be reduced by the amount of long-term disability benefits received by Mr. Webber and attributable to premiums paid by IP? Second, did Mr. Webber adequately mitigate his damages: (a) when he refused an offer of reinstatement at the Bucksport mill, and (b) in his search for alternate employment?

### 1. Collateral Source Rule

IP argues that because it self-insures its long-term disability benefits plan, IP itself paid Mr. Webber's long-term disability benefits; therefore, they do not proceed from a collateral source. IP concludes that any award of back pay should be reduced by the amount of long-term disability benefits received by Mr. Webber and attributable to the premiums paid by IP. Predictably, Mr. Webber contends that the long-term disability benefits are a collateral source and that there should be no set-off against an award of back pay.

 Under the collateral source rule, "a plaintiff who has been compensated in whole or in part for his damages by a source independent of the tortfeasor is nevertheless entitled to a full recovery against the tortfeasor."[2] *Potvin v. Seven Elms, Inc.*, 628 A.2d 115, 116 (Me.1993). "The premise underlying this rule is that either the injured party or the tortfeasor will receive a windfall if part of a loss is paid by an independent source, and as between the injured party and the tortfeasor, the injured party should reap the benefit of the windfall." *Id.* Under the Maine Human Rights Act, there is no judicial discretion to reduce a back pay award by

**2.** Even if International Paper were to argue (it has not) that the long-term disability benefits are not subject to the collateral source rule because they compensate for physical injury, not the injury suffered as a result of the employment discrimination at issue in this case, it would still be inappropriate to offset an award of back pay by the amount of independent income received by Mr. Webber. *See Me. Human Rights Comm'n v. City of Auburn*, 425 A.2d 990, 999 n. 8 (explaining that income received from a trust fund is irrelevant in determining the appropriate amount of back pay to be awarded and that "[i]t is only the amount of compensation that [the plaintiff] received or could reasonably have received on another job that is relevant in determining what she lost by being unlawfully barred from [the job in question]").

amounts received from a collateral source. *See Me. Human Rights Comm'n v. Dept. of Corr.*, 474 A.2d 860, 870 (Me.1984); *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 16–17 (1st Cir.1999).

██ Whether or not a benefit provided to employees by an employer is considered a collateral source depends on whether it is a "fringe benefit" or whether it is provided as a means of indemnifying the employer for injuries suffered by its employees. *See Allen v. Exxon Shipping Co.*, 639 F.Supp. 1545, 1547–48 (D.Me.1986). *Allen* and its progeny set forth a five-factor inquiry on this question:

> (1) whether the employee makes any contribution to funding of the disability payment; (2) whether the benefit plan arises as the result of a collective bargaining activity; (3) whether the plan and payments thereunder cover both work-related and nonwork-related injuries; (4) whether payments from the plan are contingent upon length of service of the employee; and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment recovered in a tort action.

*Allen*, 639 F.Supp. at 1548. *See also Davis v. Odeco, Inc.*, 18 F.3d 1237, 1244–45 (5th Cir.1994); *Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 932–33 (5th Cir.1992); *Reed v. E.I. Du Pont de Nemours & Co.*, 109 F.Supp.2d 459, 467–68 (S.D.W.Va. 2000); *Ruberto v. Maritrans Operating Partners, L.P.*, 1993 WL 316754 at *1 (E.D.Pa. Aug. 23, 1993).

██ In this case, IP seeks only to set off those portions of the long-term disability benefits attributable to the premiums

paid by it, and not the additional premiums paid by Mr. Webber. Nevertheless, the fact that Mr. Webber had the option of contributing additional premiums for additional coverage weighs in favor of finding that the benefit was a collateral source. There is no evidence in the record as to whether the benefit plan arose as the result of collective bargaining activity; this factor does not weigh in favor of either the plaintiff or the defendant. The long-term disability plan covers both work-related and non-work-related injuries, indicating that the plan is a fringe benefit and not an indemnification plan. Payments from the plan are not contingent upon the length of service of the employee; this weighs against a determination that the plan is a fringe benefit. The long-term disability plan does not contain specific language contemplating a set-off of benefits received against a judgment rendered in favor of the employee against the employer; this also weighs in favor of a finding that the long-term disability plan was a fringe benefit.

Having considered the factors above, the Court concludes that indemnification of the employer for liability was not a dominant purpose of the plan, and that the long-term disability policy in question is properly considered a fringe benefit. The long-term disability benefits paid to Mr. Webber therefore constitute a collateral source which may not be offset against an award of back pay under the Maine Human Rights Act.[3]

### 2. Mitigation of Damages

██ The Maine Supreme Judicial Court has held that back pay awards are meant

---

**3.** Given this ruling, the Court need not reach the other issues argued by the parties with respect to the application of the collateral source rule, including Mr. Webber's assertion that IP did not properly assert a right to offset long-term disability benefits as an affirmative defense and his argument that the benefits received are not properly attributable to IP because the premiums were paid out of Mr. Webber's post-tax earnings rather than his pre-tax earnings.

to "make the employee whole and not to penalize the employer unless that penalty is authorized by statute." *Kopenga v. Davric Maine Corp.*, 727 A.2d 906, 909 (Me.1999) (internal quotation marks omitted) (quoting *Rozanski v. A–P–A Transp.*, 512 A.2d 335, 342 (Me.1986)). A court's back pay award will be upheld absent clear error or abuse of discretion in the amount awarded. *Kopenga*, 727 A.2d at 908–09. The Court may award back pay in an amount supported by competent evidence in the record. *Id.* at 909.

■■ Back pay must be reduced by the amount that the plaintiff actually earned or "could be expected to earn with reasonable diligence in other employment." *Rozanski v. A–P–A Transp., Inc.*, 512 A.2d at 343. The burden is on the defendant to prove facts relating to the appropriate deductions from back pay. *Me. Human Rights Comm'n v. Dept. of Corr.*, 474 A.2d at 869. To show that the plaintiff was not sufficiently diligent in pursuing other employment, the defendant must do more than show that plaintiff could have taken further actions in pursuit of employment: "the range of reasonable conduct is broad and the injured plaintiff must be given the benefit of every doubt in assessing her conduct." *Me. Human Rights Comm'n v. Dept. of Corr.*, 474 A.2d at 869.

### a. Offer of Reinstatement as SQA Coordinator

It is without dispute that IP unconditionally offered Mr. Webber a position as SQA Coordinator at the mill on September 25, 2001 and again in early October 2001. The pay and benefits would have been identical to those he received as a project engineer, and he would not have had to work under the same supervisors he had worked for as a project engineer. Mr. Webber testified that he got along well with the people who would have been his supervisors had he accepted the SQA Coordinator position. Mr. Webber rejected the offer of re-employment twice because he thought he would be re-hired only to be fired again and because his feelings were hurt.

In *Ford Motor Co. v. EEOC*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), a sex discrimination case under Title VII, the United States Supreme Court held that "absent special circumstances ... the ongoing accrual of backpay liability is tolled when a Title VII claimant rejects the job he originally sought." *Id.* at 238–39, 102 S.Ct. 3057. This holding is applied by extension to actions under the Maine Human Rights Act. *See Doyle v. Dept. Human Servs.*, 824 A.2d 48, 57 n. 7 (Me. 2003) ("Because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA.") (citing *Winston v. Me. Technical Coll. Sys.*, 631 A.2d 70, 74–75 (Me.1993)). The question of whether "special circumstances" justify rejection of an offer of reinstatement is essentially a reasonableness test. *See Wilcox v. Stratton Lumber, Inc.*, 921 F.Supp. 837, 843 (D.Me.1996) (citing *Smith v. World Ins. Co.*, 38 F.3d 1456, 1464 (8th Cir.1994)).[4]

4. The cases are divided as to who bears the burden of proof as to the reasonableness of an employment discrimination plaintiff's rejection of an offer of reinstatement. *Compare Smith v. World Ins. Co.*, 38 F.3d at 1465 ("[W]e believe the burden is correctly placed upon the employer to prove that it made an offer of reinstatement and that the plaintiff's rejection of it was objectively unreasonable.") *with Boehm v. Am. Broad. Co.*, 929 F.2d 482, 485 (9th Cir.1991) ("It is only when the employer carries this initial burden [of establishing that the plaintiff failed to accept an unconditional offer to a job substantially equivalent to the one denied] that the plaintiff must establish 'special circumstances' justifying a rejection of the offer.")

With the consent of International Paper,[5] the jury was asked whether International Paper had proven by a preponderance of the evidence that Mr. Webber "should have accepted the offer of employment as SQA Coordinator on or after September 25, 2001." IP did not request jury instructions on the legal significance of an offer of reinstatement and did not object to the mitigation of damages instruction given to the jury.

In determining appropriate equitable relief, this Court is bound to follow the facts as found by the jury. *See Quint v. A.E. Staley Mfg. Co.*, 172 F.3d at 19. In light of the jury's finding on the above question, the Court cannot cut off equitable relief for unreasonable refusal to accept an offer of reinstatement in light of the jury's verdict in this case. Even if the Court is not bound by the jury's verdict, the Court declines to cut off equitable relief based on the offer of reinstatement and its refusal.

**b. Inadequate job search.**

■ International Paper argues that Mr. Webber is not entitled to back pay damages because he did not seek alternate employment with reasonable diligence. An award of back pay should be reduced by "whatever amount [the plaintiff] could with reasonable diligence have earned" between the date of the unlawful discrimination and the judgment. *Me. Human*

*Rights Comm'n v. City of Auburn*, 425 A.2d 990, 999 (Me.1981). The defendant "bears the burden of proving the facts to enable the court to determine the appropriate deduction." *Id.* However, where the defendant shows that "the former employee made no effort to secure suitable employment," the defendant-employer is relieved of the "burden [of proving] the availability of substantially equivalent jobs in the relevant geographic area." *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d at 16.

The evidence adduced at the evidentiary hearing indicated that Mr. Webber applied for six jobs, only three of which he could remember. The dates of application that Mr. Webber could recall were in the autumn of 2001. Because there is no evidence that Mr. Webber sought any jobs after 2001, the Court concludes that Mr. Webber removed himself from the labor market at the end of 2001, relieving International Paper of the burden of proving the availability of substantially equivalent jobs in the relevant geographic area beginning January 1, 2002.

■ As for the last half of 2001, although Mr. Webber's job search does not present a paragon of diligence, it is not disputed that he did make a minimal effort to obtain alternate employment. Therefore, the burden of proving failure to mitigate remains with International Paper.

---

and Miano v. AC & R Adver., Inc., 875 F.Supp. 204, 224 (S.D.N.Y.1995) ("If the employer meets its initial burden under *Ford Motor Company*, the employee must then come forward with proof that his decision to decline reinstatement was justified; if the plaintiff can adduce such proof, he does not forfeit the right to back pay and other relief accruing after the date he rejected the offer.") However, IP has not argued that the burden of proof should be shifted to Mr. Webber. Indeed, IP frames the question in its briefs as "whether International Paper sustained its burden that Plaintiff failed to mitigate his back pay and front pay dam-

ages." (Def's. Mem. re: Damages at 3.) In the absence of any argument on the subject, the Court does not consider whether the burden of proof as to mitigation of damages should be shifted from the defendant to the plaintiff in this circumstance.

5. IP did object to the form of the question, arguing that the question should have asked whether a reasonable person should have accepted the SQA offer, not whether Gary Webber should have accepted the offer, but this objection does not affect the analysis at this juncture.

128

See *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d at 16 ("As long as the claimant has made some effort to secure other employment, the burden to prove failure to mitigate normally resides with the defendant-employer.") Assuming *arguendo* that Mr. Webber's job search in 2001 did not constitute the exercise of reasonable diligence, IP has not established any facts to permit the Court to calculate what Mr. Webber might have earned with reasonable diligence. Therefore, any reduction in back pay for that period would be based on speculation and the Court need not reach the question of whether Mr. Webber exercised reasonable diligence in seeking alternate employment.

The Court therefore awards Mr. Webber back pay for the period between July 15, 2001, the date of his termination, and December 31, 2001.[6] The salary allocable to the 169–day period between July 15, 2001 and December 31, 2001 is $27,384.02.

## B. Reinstatement and Front Pay

"[R]einstatement is the overarching preference among all equitable remedies under the ADA as it most efficiently furthers the dual goals of providing full coverage for the plaintiff and of deterring such conduct by employers in the future." *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d at 19 (internal quotations omitted). This preference and the reasoning behind it apply by extension to equitable remedies under the MHRA. *See Winston v. Me. Tech. College Sys.*, 631 A.2d 70, 74 (Me. 1993).

The question before the Court is whether IP can and should reinstate Webber to his former position. *See Quint v. A.E. Staley Mfg. Co.*, 172 F.3d at 18. Mr. Webber has not argued that he is more qualified than the project engineers that remained in the department following the July 2001 reduction in force, and two additional project engineer positions were eliminated in the autumn of 2003.[7] It is clear that there is no available opening for a project engineer at the Bucksport mill; indeed David Libby, the human resources manager, testified that there were no open positions anywhere at the mill. Nevertheless, IP has offered to create a position for Mr. Webber, for the same compensation as he was receiving at the time of his termination, in order to avoid front pay liability. Under IP's proposal, Mr. Webber would first be employed doing primarily sedentary work in a project to reduce storeroom inventory, a project that is anticipated to last "for the next couple of years." (Evid. Hr'g Tr. at 72.) Although the nature of his work following the completion of the storeroom inventory project is uncertain, IP's proposal includes creating a position that would survive the project. Mr. Webber argues against reinstatement on the grounds that it would be impracticable.

Because Mr. Webber's former position no longer exists, this Court has discretion

6. The 1997 fringe benefits figure provided by Plaintiff as an exhibit at the evidentiary hearing does not help the Court to determine the value of fringe benefits that Mr. Webber was receiving at the time of his termination, given that he did not lose the value of medical benefits during the period he received long-term disability benefits and given that Mr. Webber was not contributing to a 401(k) account at the time of his termination. The Court therefore does not have an adequate basis upon which to calculate the value of lost fringe benefits, and declines to award back pay damages for the value of those lost benefits.

7. In the context of cutting off back pay and front pay liability, Plaintiff argues that these positions have not yet been eliminated because the individuals who occupied those positions are scheduled to continue working in those positions until September 2004. Regardless, the department in which Mr. Webber worked at the time he was laid off has shrunk, and there is no open project engineer position.

to refuse reinstatement. *See Quint v. A.E. Staley Mfg. Co.*, 172 F.3d at 18. Despite the preference for reinstatement, the Court finds that re-employment in a newly-created position with uncertain future prospects is an inadequate remedy for past discrimination and that such a remedy would likely require significant judicial oversight well into the future. Therefore, the Court declines to order the proposed "reinstatement."

In a case such as this, where reinstatement is not feasible, the Court has discretion to award a successful plaintiff front pay from the date of judgment forward. *See Carey v. Mt. Desert Island Hosp.*, 156 F.3d 31, 40 (1st Cir.1998); *Wilcox v. Stratton Lumber, Inc.*, 921 F.Supp. 837, 844 (D.Me.1996). "The burden falls on [the p]laintiff to prove the amount, if any, of a front pay award." *Wilcox v. Stratton Lumber*, 921 F.Supp. at 844.

In the exercise of its discretion, the Court finds that Mr. Webber has been more than adequately compensated for his injury by the award of compensatory damages and back pay. Furthermore, any award of front pay would be speculative: it is unclear how long Mr. Webber would have been able to continue working at the mill given his health difficulties, and it is unclear how long a position would have been available for him at the Bucksport mill, which continues to experience reductions in force.

## C. Statutory Cap on Compensatory Damages

██ The Maine Human Rights Act sets a statutory cap on the sum of compensatory and punitive damages awarded to a successful plaintiff. 5 M.R.S.A. § 4613(2)(B)(8). The applicable cap in this case is $300,000. *Id.* The jury awarded Mr. Webber $1,000,000 in compensatory damages and $2,000,000 in punitive damages. The Court hereby reduces the awards of compensatory and punitive damages to $300,000 and $0, respectively, to bring the damages awarded to the statutory maximum.

## D. Prejudgment Interest

Prejudgment interest is an element of compensatory damages. *See Moholland v. Empire Fire & Marine Ins. Co.*, 746 A.2d 362, 364 (Me.2000). Because the jury awarded Mr. Webber compensatory and punitive damages in excess of the statutory cap and the Court has reduced the award to the maximum amount allowed by statute, Mr. Webber cannot recover any amount of prejudgment interest on the amount awarded by the jury. The Court next turns to the question of whether prejudgment interest should be assessed on the back pay award.

In 2003, the Maine Legislature repealed the previously-existing provision on prejudgment interest (which provided that prejudgment interest "shall be assessed") and enacted a new provision, providing that prejudgment interest "is allowed." *Compare* 14 M.R.S.A. § 1602 (2002) *with* 14 M.R.S.A. § 1602–B (2004). The new legislation "applies to judgments entered on or after July 1, 2003." 2003 Me. Legis. Serv. 460 (West). Section 1602–B(5) provides that "[o]n petition of the nonprevailing party and on a showing of good cause, the trial court may order that interest awarded by this section be fully or partially waived." Although Mr. Webber addressed the issue of prejudgment interest in his Proposed Findings of Fact and Conclusions of Law, IP made no response whatsoever. As such, the Court does not reach the issue of whether there exists good cause not to award prejudgment interest on the back pay award because there was no petition that such interest be waived. Prejudgment interest on the back pay award shall be calculated at an 8%

rate pursuant to 14 M.R.S.A. § 1602–B(7)(A).

SO ORDERED.