Jacquelyn M. QUINT, Plaintiff,
Appellee,

v.

A.E. STALEY MANUFACTURING
COMPANY, Defendant,
Appellant.

Jacquelyn M. Quint, Plaintiff,
Appellant,

v.

A.E. Staley Manufacturing Company,
Defendant, Appellee.

Nos. 98–1300, 98–1342.

United States Court of Appeals,
First Circuit.

Argued Oct. 7, 1998.

Decided March 15, 1999.

Rehearing Denied April 7, 1999.

Brent A. Singer, with whom John W. McCarthy and Rudman & Winchell, LLC were on brief for appellant A.E. Staley Manufacturing Company.

Stephen A. Roach, with whom Darren G. Waggoner, Adam P. Whitney and Roach & Wise were on brief for appellee Quint.

Before TORRUELLA, Chief Judge, CYR, Senior Circuit Judge, and STAHL, Circuit Judge.

CYR, Senior Circuit Judge.

Defendant A.E. Staley Manufacturing Company ("Staley") appeals from a district court judgment awarding Jacquelyn Quint $300,000 in damages for having discharged her in violation of the Americans with Disabilities Act (ADA). Quint in turn cross-appeals from the judgment insofar as it disallowed all but $8,019 in back pay and rejected her request for reinstatement.

# I

## BACKGROUND

In December 1991 Quint went to work at Staley's potato-starch processing plant in Houlton, Maine, initially as a warehouse

worker and later as a press operator. In the latter position she manually lifted objects weighing from 70 to 100 pounds (*e.g.*, bags of starch, propane tanks), manipulated heavy machinery parts (*e.g.*, metal covers), and performed a variety of repetitive manual or overhead tasks (*e.g.*, stenciling bags, sweeping, shoveling, and adjusting spigots). Staley's automated manipulators, designed to relieve workers from heavy manual lifting, either functioned haphazardly or in some instances were inoperable. The work area was unheated and open to the outdoors both in winter and summer.

Quint consulted Dr. Hassan Abouleish in February 1993, complaining of wrist pain. Dr. Abouleish referred her to a neurologist, Dr. Jose Tungol, who performed nerve-conduction tests and diagnosed Quint with bilateral carpal tunnel syndrome (CTS). CTS is a condition in which the median nerves and nerve tendons which pass through the carpal tunnel a narrow, finger-width passageway through the wrist bone become compressed and inflamed, causing numbness or pain. Commonly, CTS is caused by repetitive, vibratory, or forceful use of the hands, or by exposure of the hands to prolonged elevation or extreme cold. Dr. Abouleish and Dr. Tungol recommended that Quint wear supportive wrist splints at night and that she be relieved from work tasks which would aggravate her condition, such as lifting objects weighing more than five or ten pounds.

On May 21, 1993, Quint notified Staley of the medical diagnosis and restrictions recommended by Dr. Abouleish. Staley directed Quint to see Dr. Richard Blum, a general practitioner whom Staley employed as its company physician. After interviewing Quint, but without performing a physical examination, Dr. Blum recommended a less restrictive lifting limit of from 20 to 25 pounds, as well as continued nighttime use of wrist splints. Notwithstanding Dr. Blum's medical advice, Staley continued to require Quint to perform all regular work duties during the next two months.

In July 1993, Staley arranged for a neurologist and CTS specialist, Dr. Bruce Sigsbee, to examine Quint. Dr. Sigsbee confirmed that Quint did indeed have work-related CTS, and recommended that Staley reduce her repetitive work tasks and abide by a maximum ten-pound lifting restriction. When Plant Manager Kevin Baker read the Sigsbee report he became "very upset." Fearing that Quint would spoil Staley's spotless workplace-safety record were she to file a workers' compensation claim, Baker ordered the production of a videotape purportedly depicting the work tasks typically performed by a press operator, but seriously downplaying the physical demands of the position. Baker then unsuccessfully lobbied Dr. Sigsbee to alter his report, and made what Dr. Sigsbee characterized as "strident" accusations that Quint was malingering. For her part, Quint balked at Baker's suggestion that she go on sick leave.

Following the Sigsbee report, Staley adjusted Quint's job description so as to require her to perform only "lighter" duties on the processing line. Because processing-line operators normally worked in teams of three or four, Staley ordered other members of Quint's team to take up the heavier or more repetitive tasks. Without consulting Quint's doctors, Baker ordered her to wear her wrist splints on the job, which caused the metal brace in the splints to bruise her wrists and ultimately to radiate pain into her elbows and shoulders.

After Dr. Blum saw Quint again in September 1993, he announced his intention to visit the job site to determine how best to accommodate her CTS. Keith Saunders, Staley's operations manager, rejected Quint's request that she be allowed to accompany Dr. Blum on the job-site visit. Around the same time, Staley's insurer retained an ergonomist to study the press-operator position and recommend suitable accommodations. As a consequence, Sta-

ley ultimately modified some of its procedures and equipment. For example, it altered the design of the so-called "cane" used to adjust spigots, and installed electric winches to lift heavy machinery covers. At the same time, it decided against heating the work area, realigning the conveyor belts or repairing the automated manipulators.

In October 1993, Dr. Sigsbee again examined Quint. Without conducting new nerve-conduction tests, he opined that her CTS was "substantially improved," and increased her weightlifting restriction to thirty pounds. Gradually, Staley began to increase Quint's job functions, reinstating her "bagging" duties (i.e., lifting and handling 100–pound bags of starch). When Quint reported increased wrist pain, Saunders told her that only Dr. Blum could order her back to "light" duty.

In December 1993, Dr. Tungol performed new nerve-conduction tests and reported overall improvement in Quint's condition, but warned that "[a] return to this activity [i.e., her regular duties] will make her vulnerable to reoccurrence of her symptoms." At year's end, Quint informed Saunders that her wrist pain had increased since November, when he had reinstituted her "bagging" responsibilities.

In early January 1994, Quint consulted Dr. David Starbuck, who notified Staley that Quint's CTS had flared up and that she should not work until further notice. At 3:15 p.m. on January 7, Baker ordered Quint to travel to Dr. Blum's office—located some 30 miles from her home—for a 3:30 p.m. appointment. Saying that she needed "reasonable notice," Quint declined to do so. Ultimately, Dr. Blum concluded that Quint could continue to perform the light-duty job, and Baker denied her request for sick leave, instead stating that Quint could either return to work or be fired. Quint complied and returned to her light-duty job.

By February 1994, however, Staley again reinstituted her "bagging" duties and Quint soon complained to Baker of worsening wrist pain and numbness. Baker nonetheless declined to consult further with Dr. Blum. On February 28, Quint consulted Dr. Jean LaBelle, a hand surgeon. After conducting tests, Dr. LaBelle reported that Quint's CTS was worsening, and recommended to Staley that she take at least six weeks off from work.

On Friday, March 4, after four days without any attempt to contact Quint, Baker ordered Saunders to send Quint a certified letter pursuant to Me.Rev.Stat. Ann. tit. 39–A, § 207,[1] notifying her that she must submit to a medical examination by Dr. Blum on Monday, March 7, and then report to Baker's office the following day to discuss the results of Dr. Blum's report. Quint did not receive the certified letter until Saturday afternoon. Although the letter informed Quint that she had the statutory right to require Staley to pay her physician to attend the Blum examination, Baker and Saunders knew before the letter was mailed that Dr. LaBelle was away on vacation and unable to attend. In addition, the letter failed to advise Quint that

1. The Maine statute provides, in pertinent part:

An employee being treated by a health care provider of the employee's own choice shall, after an injury and at all reasonable times during the continuance of disability if so requested by the employer, submit to an examination by a physician or surgeon authorized to practice as such under the laws of this State, to be selected and paid by the employer.... The employee has the right to have a physician or surgeon of the employee's own selection present at such an examination, whose costs are paid by the employer. The employer shall give the employee notice of this right at the time the employer requests an examination.... If any employee refuses or neglects to submit to any reasonable examination provided for in this Act, or in any way obstructs any such examination, or if the employee declines a service that the employer is required to provide under this Act, then such employee's rights to compensation are forfeited during the period of the infractions if the board finds that there is adequate cause to do so.

Me.Rev.Stat. Ann. tit. 39–A, § 207.

she had the right to reschedule the appointment.

Plant Manager Baker conceded at trial that he had given no thought to whether the certified-letter notice was unreasonably short and that he had simply not expected that Quint might wish to exercise her legal right to have her own doctor accompany her, even though Baker knew from past experience that Quint mistrusted Dr. Blum. For his part, however, Operations Manager Saunders acknowledged that the timing of the notice was unreasonable.

On Monday, March 7, Quint called Dr. Blum's office to cancel the appointment. The doctor's office promptly notified Baker the same day, adding that Quint had seemed "quite upset." Since the certified letter had stated that the purpose of the March 8 meeting at Baker's office had been to discuss the Blum medical report, Quint did not attend. Finally, on Wednesday, March 9, Baker fired Quint for failing to notify Staley of the reason for canceling the Blum appointment and for failing to attend the Tuesday follow-up meeting at Baker's office.

In due course Quint brought suit against Staley in federal district court, claiming *inter alia* that her discharge violated the ADA, 42 U.S.C. § 12101 *et seq.*, the Family Medical Leave Act (FMLA), 29 U.S.C. § 2611 *et seq.*, and the Maine Human Rights Act (MHRA), Me.Rev.Stat. Ann. tit. 5, § 4551.[2] Following a five-day trial, the jury found that Staley had discharged Quint because of her disability, and awarded her $300,000 in compensatory damages and $420,000 in punitive damages. The district court reduced the damages award to $300,000 pursuant to the statutory cap. *See* 42 U.S.C. § 1981a(b)(3).

Following a hearing on equitable relief, the district court disallowed all but $8,019 of Quint's $125,580 back-pay claim, largely

because she admittedly failed to apply for other jobs after her discharge. Thus, the court held that she had not exercised reasonable diligence to mitigate her back-pay damages. *See id.* § 2000e–5(g)(1). Concluding that with due diligence Quint could have obtained another job by August 1995, the court awarded $45,917 in back pay for the initial 18–month period only dating from March 1994 through August 1995 and disallowed all back pay for the period from August 1995 to the date of judgment ($79,663). It then reduced the $45,917 back-pay award by $37,898, representing the total amount Quint had received following her discharge in the form of disability insurance, AFDC benefits and food stamps.

The district court further found that it would be impracticable to reinstate Quint to her former job because there were no currently available "light-duty" positions for which she could qualify, and because ill feelings persisted between Quint and her former coworkers. The court denied a front-pay award, on the ground that the $308,019 awarded in damages and back pay afforded ample compensation. Finally, it awarded Quint $1,000 on her MHRA claim. Staley now appeals the $300,000 damages award and Quint cross-appeals from the order denying her request for full back pay and reinstatement.

## II

### *DISCUSSION*

#### A. *The Staley Appeal (No. 98–1300)*

##### 1. *Exhaustion of Arbitral Remedies*

█ First, Staley claims that the district court should have dismissed the complaint because Quint disregarded the requirement in the governing collective bargaining agreement (CBA) that employees submit all employment disputes to ar-

---

2. Prior to instituting suit, Quint had filed an unsuccessful grievance under the governing collective bargaining agreement, and her union had declined to proceed to arbitration.

Quint filed timely claims with the Equal Employment Opportunity Commission and the Maine Human Rights Commission as well.

bitration. *See* CBA, Art. 5 & 6 (June 15, 1991); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (holding that employee who voluntarily executed an employment contract containing broad arbitration clause waived right to bring employment-discrimination lawsuit); *supra* note 2.

Following oral argument in the case presently before us, the United States Supreme Court definitively rejected the very contention here advanced by Staley, thereby resolving a circuit split. *See Wright v. Universal Maritime Serv. Corp.*, —— U.S. ——, ——, 119 S.Ct. 391, 397, 142 L.Ed.2d 361 (1998) (holding that CBA arbitration clause which did not clearly and unmistakably waive employees' rights under federal anti-discrimination statute did not waive employee's right to sue). Thus, in the present case, CBA Articles 5 & 6, neither of which explicitly mentions employee rights under the ADA or any other federal anti-discrimination statute, pose no bar to the instant action.

### 2. *The Rule 50(b) Motion*

■ Staley contends that it was entitled to judgment as a matter of law because Quint did not establish that bilateral CTS is a cognizable "disability" under the ADA.

*See* Fed.R.Civ.P. 50(b). We review the denial of the Rule 50(b) motion *de novo*, viewing all evidence and resolving all credibility questions in the light most favorable to Quint. *See Ansin v. River Oaks Furniture, Inc.*, 105 F.3d 745, 753 (1st Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 70, 139 L.Ed.2d 31 (1997). We will not reverse unless it is determined that no rational jury could have returned such a verdict.

■ The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a).[3] A "disability" is defined as, *inter alia*, "a *physical ... impairment* that *substantially limits* one or more of the *major life activities* of such individual." *Id.* § 12102(2)(A) (emphasis added). The EEOC regulations themselves define "physical impairment" as "[a]ny physiological disorder, or condition ... affecting one or more of the following body systems: *neurological, musculoskeletal,* [etc.]." 29 C.F.R. § 1630.2(h)(1) (emphasis added).[4]

■ Quint's medical expert testified that she suffered, *inter alia*, from bilateral CTS, irritated ulnar nerves, and arm/shoulder syndrome, all of which readily qualify as "physical impairments."[5]

3. "To prevail on an unlawful discrimination claim under the ADA a plaintiff must prove three things by a preponderance of the evidence: first, she must show that she was disabled within the meaning of the Act; second, she must prove that with or without reasonable accommodation she was a qualified individual able to perform the essential functions of the job; and third, she must show that the employer discharged her because of her disability." *Criado v. IBM Corp.*, 145 F.3d 437, 441 (1st Cir.1998) (citation omitted). Staley challenges the jury finding relating to the first element only.

4. Courts accord deference to all reasonable ADA interpretations by the EEOC, the agency charged with administering the ADA. *See Arnold v. UPS*, 136 F.3d 854, 863–64 (1st Cir. 1998).

5. Curiously, Staley asserts that Quint's CTS "is not even an *impairment* under the ADA," Brief for Appellant at 15 (emphasis added),

ostensibly basing its contention on Dr. La-Belle's testimony that Quint suffered only nerve "irritation," rather than nerve "damage." Since irritated nerves (unlike permanently damaged nerves) presumably may improve over time, Staley argues that Quint's physiological disorder is simply transitory, not "permanent." *See id.* (citing 29 C.F.R. Pt. 1630, App. § 1630.2(j) (" '[B]roken limbs, sprained joints,[and] concussions' are usually not *disabilities.*"))(emphasis added). As is evident from its citation, Staley blurs the distinction between "impairment" and "disability." The "impairment" element is but one of three which combine to comprise an ADA "disability." Although CTS may not prove to be a "disability" in all cases, undoubtedly it is an ADA "impairment." *Cf., e.g., McKay v. Toyota Motor Mfg., U.S.A.*, 110 F.3d 369, 372 (6th Cir.1997) ("Under the terms of the ADA, all parties agree that carpal tunnel syndrome constitutes a 'physical impairment.' "); *Watson v. Cencom Cable Income Partners*, 993

Quint alleged that her physical impairment adversely affected three major life activities: lifting, caring for herself, and working. As we conclude that she adduced sufficient evidence that her physical impairments substantially affected her ability to work, *see infra;* 29 C.F.R. § 1630.2(1) ("Major life activities" means "functions such as ... working"), we need not consider her further claims that lifting may constitute a distinctly cognizable "major life activity," *compare* Brief for Appellant at 12 n. 11, *with* 29 C.F.R. Pt. 1630, App. § 1630.2(i) (expressly identifying "lifting" as a distinct "major life activit[y]"), and that she adduced sufficient evidence regarding the effect her CTS had on her *nonoccupational* capacities to care for herself and to lift.

The principal dispute on appeal relates to the "substantial limitation" element. EEOC regulations define "substantially limits" as "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii)[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). Among the considerations pertinent to the "substantial limitation" element are "(i) [t]he nature and severity of the [physical] impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* § 1630.2(j)(2).

■ Staley insists that Quint failed to establish an *existing* "substantial limitation," because at best her medical doctors' forecasts that she could not lift more than ten pounds were evidence of a predisposition to *future* serious injury. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(h) (mere

"predisposition to illness" cannot be an ADA disability). At bottom, then, Staley faults Quint's medical experts for failing to perform actual weightlifting tests by requiring her to lift progressively heavier objects.

Staley neither cites apposite authority for its position nor to our knowledge has any court held that ADA plaintiffs *must* undergo actual physical assessments of their respective capacities to engage in particular major life activities in order to establish that their ability to do so is limited. On the contrary, through competent medical testimony an ADA plaintiff may demonstrate that her own preemptive decision to limit or refrain from a major life activity was necessary to avoid placing herself or others at imminent risk of physical injury. *See, e.g., Bragdon v. Abbott,* 524 U.S. 624, ——, 118 S.Ct. 2196, 2206, 141 L.Ed.2d 540 (1998) ("The Act addresses substantial limitations on major life activities, *not utter inabilities.* Conception and childbirth are not impossible for an HIV victim but, without doubt, are dangerous.") (emphasis added).

■ Tellingly, Staley's own medical expert actually relied on this predictive methodology in assessing Quint's condition. Likewise, commonsense dictates that an ADA claimant may rely on the preemptive risk assessments made by her medical experts, subject of course to later cross-examination regarding their methodology and their personal knowledge of the relevant medical history. In that very vein the jury found the assessments offered by Quint's expert witnesses to be creditworthy. *See Criado v. IBM Corp.,* 145 F.3d 437, 440–41 (1st Cir.1998) (on Rule 50(b) motion, all credibility issues are resolved in nonmovant's favor).

■ Staley further argues that Quint simply showed that her CTS resulted from a temporarily "irritated" median nerve, rather than from permanent nerve "dam-

F.Supp. 1149, 1152 (M.D.Tenn.1997) ("The defendant does not seem to dispute that car-

pal tunnel syndrome constitutes a physical impairment.").

age." Thus, she failed to show that her impairment entailed any "permanent or long term impact." *See supra* note 5. Once again, we cannot agree.

Quint adduced competent evidence that her carpal nerve irritation was both recurrent and permanent. Dr. LaBelle testified that "the moment [Quint] starts using her hands [ ] the [seriousness of her CTS] will rise right up immediately like that.... It's very seldom that a tendinitis that occurs that flares up to a level that she had it will ever revert back to normal." Similarly, Dr. Sigsbee testified that in July 1993 he concluded that Quint "probably would not be able to perform that kind of [heavy-duty] work ever again in the future." In December 1993, Dr. Tungol likewise warned that "[a] return to this activity [*i.e.*, her former duties, such as "bagging,"] will make [Quint] vulnerable to reoccurrence of her symptoms." Moreover, no medical doctor, except non-CTS-specialist Dr. Blum, ever cleared Quint to return to her regular duties. *Cf. Wilmarth v. City of Santa Rosa*, 945 F.Supp. 1271, 1276 (N.D.Cal.1996) (finding plaintiff's CTS "temporary," hence not an ADA disability, where she "was cleared by her doctors to return to full clerical duties"); *Fink v. Kitzman*, 881 F.Supp. 1347, 1377 (N.D.Iowa 1995) (no ADA disability where plaintiff "offered no evidence whatsoever as to whether her [CTS] can be expected to improve, continue, or deteriorate"). Thus, credited by the jury as we must deem it to have been, *see Criado*, 145 F.3d at 440–41, the medical evidence presented by Quint provided ample support for a factual finding that her impairment was not merely transitory. *Cf. id.* (rejecting defendant's contention that jury was compelled to find that plaintiff's impairment was "a temporary mental condition").

An ADA claimant assumes a more fact-specific burden of proof in attempting to demonstrate that her impairment "substantially limits" the major life activity of "working." In the context of the major life activity of working, the term "substan-tially limits" means "significantly restricted in the ability to perform either a *class of jobs* or a *broad range of jobs in various classes* as compared to the average person having *comparable training, skills and abilities*. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i) (emphasis added). Other relevant factors include: "(A) [*t*]*he geographical area* to which the individual has reasonable access; (B) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, *within that geographical area*, from which the individual is also disqualified because of the impairment (class of jobs); and/or (C) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, *within that geographical area*, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes)." *Id.* § 1630.2(j)(3)(ii) (emphasis added).

In regard to the geographical/job class element, Quint established that her CTS restrictions did more than merely disqualify her for a particular job at Staley. *Cf., e.g., Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 727 (5th Cir.1995) (no ADA disability where arm injury prevented plaintiff from performing only the small subset of welding assignments requiring her to climb); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir.1994) (no ADA disability where asthma merely prevented plaintiff from working in hospital blood bank); *Shpargel v. Stage & Co.*, 914 F.Supp. 1468, 1474 (E.D.Mich.1996) (no ADA disability where CTS simply prevented plaintiff from working more than eight hours a day). The inability to lift heavy objects and perform repetitive manual tasks can translate across a broad spectrum of physically demanding jobs. *See,*

*e.g., Cochrum v. Old Ben Coal Co.,* 102 F.3d 908, 911 (7th Cir.1996) ("The physical restrictions Cochrum's physician placed upon him no overhead work, heavy lifting, or pulling and pushing out from his body might apply to a broad range of jobs, and are more than job specific."). Moreover, in the geographical area where Quint resides, physically demanding jobs are an economic mainstay. In this vein, Quint testified without contradiction that she had held a variety of jobs entailing manual labor prior to her employment at Staley, ranging from potato harvesting in twelve-hour shifts, to house cleaning and house painting.

Moreover, she adduced corroborative expert testimony. *Cf. Helfter v. UPS, Inc.,* 115 F.3d 613, 617–18 (8th Cir.1997) (plaintiff with CTS adduced no evidence concerning "various classes [of jobs] within a geographical area to which she has reasonable access," other than her own conclusory statements about her job prospects); *Crumpton v. St. Vincent's Hosp.,* 963 F.Supp. 1104, 1113 (N.D.Ala.1997) (plaintiff adduced only her conclusory deposition testimony that she was disabled from all institutional-cooking jobs in her geographical area). Thus, on cross-examination Dr. Sigsbee acknowledged that Quint's CTS and the attendant lifting restrictions "probably preclude a lot of physical jobs," and that "there are a lot of physical jobs in Maine." Nor did Staley raise contemporaneous objection to Dr. Sigsbee's expert qualifications regarding Maine vocations.[6] Furthermore, Dr. Sigsbee's deficiencies in this subject matter area are far from self-evident, since he had practiced in northern and southern Maine for approximately seventeen years, and his specialization in CTS presumably afforded him adequate exposure to the impact of CTS upon in-state job prospects.

Nor is the burden of proof incumbent upon an ADA plaintiff in relation to this element particularly formidable. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(j) ("The terms 'numbers and types of jobs' and 'number and types of other jobs,' as used in the factors discussed above, are not intended to require an onerous evidentiary showing. Rather, the terms only require the presentation of evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (*e.g.,* 'few,' 'many,' 'most') from which an individual would be excluded because of an impairment."); *supra* note 4. Since all genuine credibility issues must be resolved in plaintiff's favor, *see Ansin,* 105 F.3d at 753, Dr. Sigsbee's testimony alone, which came in without objection, sufficed to generate a triable issue of fact.

In addition, Quint adduced competent evidence that her training, knowledge, skills a high school education and a work history of heavy physical labor likely would restrict her to such jobs, which were also the most prevalent in her geographical area. *Compare Garza v. Abbott Laboratories,* 940 F.Supp. 1227, 1236 (N.D.Ill.1996) (plaintiff proved that her "education, skills, and work experience qualify her for clerical, secretarial, and retail positions," and that CTS disabled her from doing "a wide variety of work related activities," including typing), *with McKay v. Toyota Motor Mfg., U.S.A.,* 110 F.3d 369, 371 (6th Cir. 1997) (finding no ADA "disability" where CTS-afflicted plaintiff was fired from an

---

**6.** Quint attempted to introduce other evidence from Dr. LaBelle, who would have testified on deposition that Quint was disqualified from most "heavy labor jobs," "most factory and automation jobs," and "clerical work," all of which are most prevalent in her geographical area. Prior to trial, however, the district court granted Staley's motion *in limine* under Fed.R.Evid. 702, ruling that LaBelle did not qualify as an expert on these matters. In the version of Dr. LaBelle's deposition which was read to the jury, however, some of Dr. La-Belle's excluded opinions had not been redacted. Staley contends that the error was inadvertent, while Quint claims that Staley orally agreed to the inclusion of the disputed testimony. Since we find the Sigsbee testimony itself sufficient, we need not determine the admissibility of the LaBelle testimony.

assembly-line job, but she was a college graduate who was pursuing her teaching certificate at the time of her discharge).

■ Finally, Staley cites several decisions purportedly holding that "mild" CTS cannot, *as a matter of law*, qualify as an ADA "disability". On close inspection, however, these authorities simply hold that the respective ADA claimants had not established that CTS substantially limited their *particularized* job prospects.[7] The ADA explicitly contemplates that the "disability" determination is to be made by the factfinder on an individualized, case-by-case basis. *See* 42 U.S.C. § 12102(2)(A) (defining "disability" as "a physical . . . impairment that substantially limits one or more of the major life activities *of such individual*") (emphasis added).[8]

■ On appeal from a judgment entered pursuant to Rule 50(b), we do not consider which party put forth the more convincing case, but whether the party with the burden of proof adduced enough evidence to enable a rational jury to return a verdict in her favor. As Quint met the required evidentiary threshold, we must affirm the liability verdict.

### 3. *Damages*

■ Staley next contends that the compensatory and punitive damages awards were excessive. The jury awarded Quint $300,000 in compensatory damages, *see McKinnon v. Kwong Wah Restaurant*, 83 F.3d 498, 506–07 (1st Cir.1996) (amended ADA makes emotional harm compensable), and, based on Staley's annual net income of $65–85 million, $420,000 in exemplary damages. The district court reduced the combined award to $300,000 pursuant to the statutory cap in 42 U.S.C. § 1981a(b)(3)(D).[9] Staley argues that the

---

7. The CTS cases cited by Staley are not factually apposite. Neither Quint nor her doctors ever conceded that she could return without restriction to her regular press-operator duties. *Cf., e.g, Price v. Marathon Cheese Corp.*, 119 F.3d 330, 332, 336 (5th Cir.1997) (plaintiff voluntarily performed "full duties" and worked overtime just before her discharge, and testified that "she was capable of doing other [comparable] jobs available to her at [defendant]"); *Fink*, 881 F.Supp. at 1377 (plaintiff had a lifting restriction only, one which concededly did not prevent her from performing all functions of her former position, *even without accommodation*). No one seriously disputed that Quint's press-operator position was a heavy-labor job, *cf. McKay*, 110 F.3d at 372 (plaintiff proved that she could not do any "heavy" manufacturing jobs, but her expert conceded that her former position was not a heavy-duty manufacturing job), nor that Staley had no jobs other than press operator which were within Quint's CTS restrictions, *cf. Watson*, 993 F.Supp. at 1153–54 (plaintiff, a cable installer, proved that he could not do *repetitive* manual labor, but conceded the existence of other nonrepetitive manual-labor jobs). Finally, since leaving Staley, Quint has never worked at another heavy-labor job. *Cf. Jenkins–Allen v. Powell Duffryn Terminals*, 18 F.Supp.2d 885, 892 (N.D.Ill.1998) (plaintiff successfully worked after discharge as a packer, a machine operator, and an unloader); *Crumpton*, 963 F.Supp. at 1113 (plaintiff's allegation that she was disabled from all institutional cooking jobs was fatally undercut when she took another job as an institutional cook).

8. In a similar vein, Staley cites to ADA legislative history wherein Congress estimated in 1990 that approximately 43 million persons in the United States had qualifying ADA "disabilities," among which about 27 million were hearing or speech impaired. Dr. Sigsbee testified that about 15% of the U.S. population suffers from CTS in varying degrees. Staley syllogizes, therefore, that Congress could not have contemplated that the 37 million Americans with CTS had an ADA "disability." Since § 12102(2)(A) expressly makes the "disability" inquiry case-specific, however, this theory founders as well. Congress reasonably could predict that some medical conditions, like hearing impairments, routinely would limit a plaintiff's ability to perform in a broad spectrum of jobs. By contrast, CTS might substantially limit only those persons who qualified, by education, experience or geographical location, for heavy labor jobs which would aggravate their CTS symptoms. Thus, we do not consider it strange that Congress would have hazarded no estimate regarding the number of qualifying CTS cases.

9. For no apparent reason the final district court order characterized the post-cap $300,000 award as being in the nature of "com-

jury rationally could not have awarded Quint $300,000 in compensatory damages since she established no serious emotional injuries stemming from her discharge. Be that as it may, since we find the punitive damages award itself proper, and it alone exceeded the $300,000 statutory cap, there is no need to revisit the compensatory-damages issue. *See Hogan v. Bangor and Aroostook R.R. Co.,* 61 F.3d 1034, 1037 (1st Cir.1995).[10]

An ADA plaintiff may recover punitive damages provided she establishes, *inter alia,* that the defendant engaged in a discriminatory practice "with *reckless indifference* to the [plaintiff's] *federally protected rights.*" 42 U.S.C. § 1981a(b)(1)(emphasis added).[11] Staley contends that the only evidence of reckless indifference was its short notification of the March 7, 1994 appointment with Dr. Blum and of Quint's right to require Staley to compensate her doctor for attending the appointment. Staley argues that since these rights arise under Maine law, *see*

Me.Rev.Stat. Ann. tit. 39–A, § 207, *supra* note 1, rather than the ADA, Staley's belated notification cannot as a matter of law establish its reckless indifference to a "*federally* protected right[ ]." We reject its claim, since the ADA accorded Quint the *right* to be free from discharge *on account of* her disability and there was ample evidence that Staley discharged her with reckless indifference to that "federally protected right[ ]."[12]

In July 1993, Plant Manager Baker became "upset" about Dr. Sigsbee's diagnosis of Quint's disability and its potential adverse effect on Staley's spotless workers' compensation record. Baker "strident[ly]" asserted that Quint was malingering, exerted pressure on Dr. Sigsbee to alter his diagnosis, and produced a videotape which misleadingly understated the job-duty requirements of a press-operator.

In early January 1994, when Quint's physician recommended that she not work at all, Baker made the decision to refer

pensatory damages." By its terms, however, section 1981a(b)(3) neither contemplates nor requires such a characterization. *See* 42 U.S.C. § 1981a(b)(3)(D)("The *sum* of the amount of compensatory damages awarded under this section ... and the amount of punitive damages awarded under this section [ ] shall not exceed ... $300,000.") (emphasis added). Thus, the district court's characterization may be disregarded.

10. As long as some compensatory damages are awarded *or* the district court awards back pay, punitive damages are recoverable under the ADA. *See Provencher v. CVS Pharmacy,* 145 F.3d 5, 11 (1st Cir.1998). Although Staley argues on appeal that the compensatory-damages award was *excessive,* it does not contend that Quint failed to prove compensable injury. Nor could it. Quint and family members testified that she was emotionally "devastated" by the termination, and suffered from insomnia. Moreover, notwithstanding her reputation as "a very hard worker," some townspeople thereafter branded her a malingerer. Around this time, she also learned that she needed oral surgery to remove cancerous growths and feared that her group medical coverage would lapse. Thus, a rational jury could have awarded at least nominal compensatory damages. Finally, even if she had

proven no compensatory damages, the back-pay award itself afforded a sufficient predicate for a punitive-damages award. *See id.* at 12; *infra* Section II.B.1.

11. The denial of a motion for judgment as a matter of law on punitive damages is reviewed *de novo, see Provencher,* 145 F.3d at 10, and will not be disturbed unless we consider it "certain" that the award exceeds an amount reasonably necessary to punish and deter, *see CEH, Inc. v. F/V Seafarer,* 70 F.3d 694, 706 (1st Cir.1995).

12. We note also that there is serious doubt whether this issue was preserved for appeal, since Staley failed to articulate its theory with adequate clarity prior to its post-verdict Rule 50(b) motion. *See Correa v. Hospital San Francisco,* 69 F.3d 1184, 1196 (1st Cir.1995) ("The movant cannot use [a Rule 50(b) ] motion as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict."). Normally, therefore, we would reverse only "upon a showing of plain error resulting in a manifest miscarriage of justice." *Simon v. Navon,* 71 F.3d 9, 13 (1st Cir.1995). Nevertheless, since we conclude that Staley has not demonstrated reversible error, *see infra,* we bypass the waiver question.

Quint to Dr. Blum, who had consistently downplayed her impairment. Yet Baker gave Quint a mere fifteen minutes' notice of the appointment and rejected her physician's recommendation that she cease work until further notice.

Moreover, Operations Manager Saunders testified that the certified-mail notice Baker had given Quint of the later March 7, 1994 appointment with Dr. Blum, *see supra* Section I, was unreasonably short. Importantly, Baker himself conceded at trial that he had given no thought to whether the notice was reasonable, which itself fairly may be considered a clear acknowledgment of reckless indifference. Baker also knew that Dr. LaBelle, Quint's physician, could not be available on March 7 because he was away on vacation. Nevertheless, after learning that Quint was "upset" and that she had canceled the March 7 appointment, Baker reacted by terminating her employment for failing to comply with the unreasonable certified-mail notice she had been given.

█ In addition, contrary to Staley's contention the fact that the March 5, 1994 notice violated Maine law in no sense precluded a punitive damages award under the ADA. Section 1981a(b)(1) does not state "with reckless indifference to the [plaintiff's] federally protected rights, *and only those federally protected rights.*" Thus, the jury rationally could conclude that Baker recklessly utilized Quint's alleged "insubordination" as an excuse for discharging her by reason of her disability.

Finally, Staley neither suggests another rationale which would preclude a finding that the totality of Staley's conduct was "outrageous," [13] nor challenges the punitive damages calculation itself. Accordingly, the $420,000 punitive damages award alone afforded ample support for the $300,000 damages award approved by the district court.

## B. *The Quint Cross-Appeal (No. 98–1342)*

### 1. *The Back-Pay Award*

#### a) *The Failure to Mitigate Damages*

█ Quint contends that the district court erred in reducing her back-pay claim from $125,580 to $45,917, representing 18 months' lost wages. The court reasoned that Quint had not attempted to mitigate damages by seeking suitable alternative employment following her discharge. Quint responds that Staley failed to prove, *inter alia,* that there were substantially equivalent jobs available in the relevant geographic area. We review the back-pay award for abuse of discretion. *See Carey v. Mount Desert Island Hosp.,* 156 F.3d 31, 40 (1st Cir.1998).

█ A prevailing ADA claimant is presumptively entitled to all back pay which would have accrued from the termination date to the entry of judgment, *see Albemarle Paper Co. v. Moody; Halifax Local No. 425, United Papermakers and Paperworkers, AFL–CIO,* 422 U.S. 405, 421–22, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Lussier v. Runyon,* 50 F.3d 1103, 1109 n. 7 (1st Cir.1995), provided it is made to appear that "reasonable diligence [was exercised in the effort to secure] oth-

---

**13.** While this appeal was pending, the United States Supreme Court granted certiorari in *Kolstad v. American Dental Ass'n,* 139 F.3d 958 (D.C.Cir.) (en banc) (holding that a claimant cannot recover punitive damages under § 1981a unless he demonstrates that the defendant's culpability exceeded the level needed to recover compensatory damages, *i.e.,* mere intentional discrimination), *cert. granted,* —— U.S. ——, 119 S.Ct. 401, 142 L.Ed.2d 326 (1998). Since this court, and accordingly this panel, applies this heightened standard as well, *see McKinnon,* 83 F.3d at 507 ("Plain-

tiffs must first prove intentional discrimination, then must prove actual injury or loss therefrom to recover compensatory damages, and must meet an even *higher standard* establishing that the employer acted with malice or reckless or callous indifference to their rights to recover punitive damages.") (emphasis added; citation omitted); *cf. Hernandez–Tirado v. Artau,* 874 F.2d 866, 869 (1st Cir. 1989) (affirming award of compensatory damages, but setting aside § 1981 award of punitive damages for insufficient evidence), *Kolstad* will not affect the present appeal.

er suitable employment," *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231–32, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). As long as the claimant has made some effort to secure other employment, the burden to prove failure to mitigate normally resides with the defendant-employer, *see Carey,* 156 F.3d at 41; *Odima v. Westin Tucson Hotel,* 53 F.3d 1484, 1497 (9th Cir.1995), which then must show that (i) though substantially equivalent jobs were available in the relevant geographic area, (ii) the claimant failed to use reasonable diligence to secure suitable employment. *See id.*

■ Staley did not attempt to prove that substantially equivalent jobs existed during the relevant time period, nor did Quint attempt to obtain a job during the forty-plus months following her discharge. In the relatively rare case where an employee has remained completely idle following her discharge, some courts of appeals have required that the defendant-employer nonetheless demonstrate the same two elements: (1) the availability of substantially equivalent jobs and (2) the absence of reasonable diligence by the former employee. *See, e.g., Booker v. Taylor Milk Co.,* 64 F.3d 860, 866 (3d Cir.1995); *Odima,* 53 F.3d at 1497; *Hutchison v. Amateur Electronic Supply, Inc.,* 42 F.3d 1037, 1044 (7th Cir.1994); *accord Rasimas v. Michigan Dep't of Mental Health,* 714 F.2d 614, 624 (6th Cir.1983). Yet, in none of these cases did the employer squarely urge the court to adopt the exception advocated by Staley; namely, that once an employer has shown that the claimant sought no jobs, it should be relieved of any burden to prove the existence of substantially equivalent positions.

Other courts of appeals, squarely confronted with the present contention, uniformly have relieved the defendant-employer of the burden to prove the availability of substantially equivalent jobs in the relevant geographic area once it has been shown that the former employee made no effort to secure suit-

able employment. *See, e.g., Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 54 (2d Cir.1998); *Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1527 (11th Cir.1991); *Sellers v. Delgado College,* 902 F.2d 1189, 1193 (5th Cir.1990). We likewise opt for the mitigation-defense exception adopted in these cases.

■ Where an ADA claimant refrains from pursuing alternative employment, we consider it reasonable to presume at the outset that she did so for an articulable reason, perhaps because she possessed information which suggested that a job search would have been futile. Since it is the claimant who would possess any such information, however, she is likely to be in the better position to explain her preemptive decision to take no action to obtain employment. We believe it will be the extraordinary case in which an ADA claimant's decision to withdraw from the job market can be found to have been justifiable, given that virtually all reemployment prospects are plainly precluded absent some effort to reenter the job market. Thus, we believe the mitigation policy fostered by the ADA will be better served by the approach we adopt today, since it affords reasonable inducements for ADA claimants to attempt to secure alternative employment. Accordingly, the district court correctly ruled that Quint's utter failure to mitigate warranted the $79,663 reduction in the back-pay award.[14]

### b) *Collateral–Source Benefits*

■ Quint next contends that the district court abused its discretion in reducing her back-pay award by the aggregate amount of the disability insurance proceeds and the AFDC and food-stamp benefits received following her termination. We agree.

■ Under the Maine Human Rights Act the court would lack discretion to deduct from a back-pay award any post-

---

14. Staley has not cross-appealed from the 18 months' back-pay award.

termination collateral-source payments received by the discharged employee. *See Maine Human Rights Comm'n v. Department of Corrections*, 474 A.2d 860, 869–70 (Me.1984) ("*MHRC* ").[15] Consequently, even if the district court could reduce the ADA back-pay award by the amount of the collateral benefits Quint received, it could not reduce the MHRA back-pay award to which the jury verdict simultaneously entitled her.

Staley argues that *MHRC* is inapposite, for two reasons. First, it notes that *MHRC* is predicated on equitable principles and that the plaintiff in *MHRC* "rightfully" received unemployment benefits whereas Quint "manipulated" the welfare system. Even assuming these characterizations of the respective claimant's conduct were meritorious, however, *MHRC* makes very clear that the collateral-source rule permits no judicial discretion. *See MHRC*, 474 A.2d at 870 (" '[A] consistent approach to this legal question seems preferable to a virtually unreviewable discretion which may produce arbitrary and inconsistent results.' ") (citation omitted).

Second, Staley argues that incorporation of the collateral-source rule into the MHRA discrimination case law by the Maine Supreme Judicial Court ("SJC") in *MHRC* is called into question by *Winston v. Maine Technical College Sys.*, 631 A.2d 70, 74 (Me.1993), where the SJC noted that the MHRA "generally tracks federal antidiscrimination statutes, [so] it is appropriate to look to federal precedent for guidance in interpreting the MHRA." Once again, however, assuming the quoted statement is correct as a general principle, it avails Staley nothing.

 The generalization to which Staley alludes in *Winston* does not permit a federal court to presume that all prior SJC decisions which announced MHRA standards in conflict with emerging federal standards were thereby overruled. Absent conspicuous evidence that a state's highest court has abandoned a previously-announced rule, it is not for the federal courts to presume as much. *See Carlton v. Worcester Ins. Co.*, 923 F.2d 1, 3 n. 5 (1st Cir.1991) ("While it is not necessary that a state case be explicitly overruled by the state court in order to lose its persuasive force, there must at least be footprints pointing conspicuously in that direction.") (citation omitted); *Caraccioli v. KFC Mfg. Corp.*, 761 F.Supp. 119, 120 (M.D.Fla.1991) ("Unlike a state court, the federal courts, in diversity cases, 'are not free to overrule existing state precedent or chart the future course of state law in such manner as we may see fit.' ") (citation omitted).

Moreover, *MHRC* could not have been more emphatic. After surveying the divergent collateral-source rules in other jurisdictions, and addressing the difficult policy choices presented, the SJC definitively and categorically opted for a clear rule excluding collateral-source payments from the back-pay equation. *MHRC*, 474 A.2d at 870 ("If either the victim of the discrimination or the discriminating employer is going to receive a windfall because part of the victim's loss has been paid for by a third party, it is more just that the windfall should inure to the injured party than to the wrongdoer."); *see Pine v. Cole's Express, Inc.*, 523 A.2d 1001, 1002 (Me.1987) (expressly refusing to reexamine *MHRC* collateral-source rule).

Moreover, even if *Winston* were deemed adequate license for us to forecast what the SJC might do upon revisiting *MHRC*, the principle enunciated in *Winston* would provide useful guidance only if a consensus existed on the collateral-source issue among the *federal* courts. Yet the courts of appeals are in disagreement regarding the collateral-source issue as it relates to

---

15. Although Quint asserted the *MHRC*-based argument in her trial brief, the district court

did not address it.

discrimination claims under federal law,[16] and the United States Supreme Court has yet to address the issue. Thus, there is no "federal precedent" consensus upon which the SJC might "piggy-back" its state rule.

Accordingly, Quint is entitled to an MHRA back-pay award free of reductions attributable to collateral-source payments. Thus, the final back-pay award must be increased from $8,019 to $45,917.

## 2. *Reinstatement*

 The district court ruled that reinstatement would be impracticable because there were no available "light-duty" jobs Quint could perform, and the "tensions" between Quint and her former co-workers would create an intolerable work environment. We review its decision only for abuse of discretion, *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 353 (1st Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 341, 142 L.Ed.2d 281 (1998), and will reverse only for " 'a meaningful error in judgment,' " *Lussier,* 50 F.3d at 1111 & n. 9 (citation omitted).[17] Although the district court has considerable equitable discretion to deny reinstatement, the two grounds it ultimately relied upon afford an insufficient basis for affirming its ruling. Accordingly, we must remand for further proceedings. *See, e.g., id.* at 1115.

Staley points to evidence that no "light-duty" jobs are currently available, and argues that the ADA does not require that a "new" job be created for Quint. *See Shea v. Tisch,* 870 F.2d 786, 788–90 (1st Cir. 1989). Be that as it may, Staley has yet to confront the appropriate inquiry: whether it can and should reinstate Quint to her *former* position as a *press operator.*

Although the district court possesses the requisite discretion to refuse reinstatement if an ADA claimant's former position *no longer exists, see, e.g., Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1254 (5th Cir.1995); *Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338, 1346 (9th Cir.1987); *Eldred v. Consolidated Freightways Corp. of Delaware,* 907 F.Supp. 26, 28 (D.Mass.1995), we can discern no record evidence that there are no press-operator positions for which Quint could qualify. Staley offered Operations Manager Saunders as its sole witness at the equitable-remedy hearing. Saunders testified that no "light-duty" positions currently existed at Staley. According to Saunders, a "light-duty" position meant one which was "not makeshift" and which the employee could "do within [her] physical restrictions." Asked to define what physical restrictions were accommodated within the term "light-duty," Saunders testified: "I'm saying just about—it would depend on the restrictions the individual has." Although he stated that he did not know Quint's current restrictions, he testified that no available jobs could accommodate a ten-pound weightlifting restriction.

 Moreover, according to Saunders a post-March 1994 reduction-in-force further frustrated any such accommodation because employees thereafter "worked harder and did more work." Furthermore, two or three people had left the process department in the past year, either on disability or retirement, and Staley

---

**16.** Three circuits hold that the district court has the discretion to deduct collateral-source payments, *see, e.g., Orzel v. City of Wauwatosa Fire Dep't,* 697 F.2d 743, 756 (7th Cir.1983); three circuits hold that the court lacks this discretion, *see, e.g., Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77, 82–83 (3d Cir.1983); and in four other circuits there are conflicting panel opinions, *see, e.g., Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1171 n. 8 (6th Cir. 1996) (acknowledging ongoing intra-circuit rift). We have yet to take a firm position. *See Lussier,* 50 F.3d at 1109 (noting, *in dicta,*

that "we tend to agree with those courts that have held the interplay between collateral benefits and back pay to be a matter within the district court's discretion").

**17.** As an alternate ground for denying reinstatement, Staley argues that Quint demonstrated no motivation to return to work. As the district court made no such factual finding and the relevant evidence was hotly disputed, we cannot affirm on this ground.

had hired two temporary part-time replacements. Saunders declined to classify the lighter-duty position Quint held prior to her 1994 discharge as a "light-duty" position, because Staley had intended those accommodations to be temporary only, not permanent. Thus, he said, a permanent accommodation for Quint's disability was simply "impossible." The conclusory and unelaborated testimony by Saunders provided inadequate support for denying reinstatement.

In the first place, reinstatement is the "overarching preference" among all equitable remedies under the ADA, as it most efficiently furthers "the dual goals of providing full coverage for the plaintiff and of deterring such conduct by employers in the future." *Selgas v. American Airlines, Inc.,* 104 F.3d 9, 12 (1st Cir.1997). Secondly, the unmistakable import of the Saunders testimony is that Staley *did* have currently available press-operator positions, but that it *chose not* to reinstate even the reasonable accommodations afforded Quint in 1993–94.

Thus, Quint testified: "If they would let [her] do the lighter-duty position ... [she held previously]," she would have been "physically ... able to work at Staley." Moreover, Saunders agreed that Staley "believed [Quint] could do the job" at the time she was fired, and that "the company thought that her inability to lift was something you could work around with respect to that particular job." Based on this evidence, the jury reasonably found that Quint was "qualified"; that is, capable of performing the "essential functions" of the press-operator position with or without reasonable accommodation. *See supra* note 3.

In determining appropriate equitable relief, the district court was strictly constrained by these jury findings. *See, e.g., United States EEOC v. Century Broadcasting Corp.,* 957 F.2d 1446, 1463 (7th Cir.1992); *Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1048 (2d Cir.1992); *Harvis v. Roadway Express, Inc.,* 923 F.2d 59, 61

(6th Cir.1991). Thus, were it to appear that a press-operator position is available at Staley, the district court would be required to assume that Quint could perform it, with reasonable accommodation.

Saunders suggested that Quint would not be returned to the "same" press-operator position because an alleged post-March 1994 "reduction in force" had required employees to "work[ ] harder." Absent some further evidentiary development, however, there is no reliable way to determine the degree, if any, to which the alleged reduction-in-force may have altered press-operator responsibilities so as to aggravate Quint's CTS. Furthermore, even if it were to be assumed that the alleged reduction-in-force resulted in increased press-operator duties, the question would remain whether Staley reasonably could have accommodated Quint's disability within the modified press-operator position. After all, the jury found nothing more than that, *as of the date Quint was discharged,* Staley had *not* failed to make reasonable accommodations for her disability. Because the jury was never instructed that Staley could meet its ADA obligation merely by making a *temporary* accommodation, this finding may simply reflect the jury's recognition that the parties were engaged in ongoing negotiation and consultation over what measures would achieve an appropriate accommodation.

Moreover, since Staley illegally discharged Quint in March 1994 it was not necessary for the jury to determine what further accommodations Staley would have been obligated to make as future conditions might warrant. For example, Saunders conceded that "several employees at Staley other than [plaintiff] have been given permanent light-duty jobs," some when they "got hurt." At trial, Baker acknowledged that the quest for reasonable accommodation was an ongoing, wait-and-see process. *See Criado,* 145 F.3d at 445 ("The duty to provide reasonable accommodation is a continuing one, however, and

not exhausted by one effort.") (quoting *Ralph v. Lucent Technologies, Inc.*, 135 F.3d 166, 172 (1st Cir.1998)); 29 C.F.R. § 1630.2(*o*)(3) ("[I]t may be necessary for the covered entity to initiate an informal, interactive process" with the disabled employee.).[18] Significantly, Saunders acknowledged that Staley *never contended that its accommodation* of Quint's disability would cause it "undue [financial] hardship." *See* 42 U.S.C. § 12112(b)(5)(A) (employer must make reasonable accommodation "unless [it] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity"). Moreover, the trial record amply documented other possible accommodations as well.

The ergonomist hired by Staley's insurer made several recommendations which Staley elected not to adopt, including one which would have excused Quint from overtime work. *See id.* § 12111(9)(B) (reasonable accommodation may include "modified work schedules"). In addition, Staley could have elected to heat the warehouse and/or the processing areas and to repair the air system which powered the automatic manipulators' suction devices. The latter accommodation would have relieved press operators from lifting heavy bags by hand. Finally, since process operators work in teams, with each person performing discrete assembly-line functions, Staley might have assigned Quint permanently to a team position which minimized stress on her wrists, arms and shoulders. Thus, to deny reinstatement on the present record would reward Staley for terminating prematurely the required effort to reach a reasonable accommodation.

Were it made to appear on remand that a press-operator position is available, Quint presumably would be entitled to reinstatement by virtue of the jury verdict in this case, *at least* on the same terms allowed by Staley prior to March 1994. Should additional accommodations be required, Staley would need to determine in the first instance whether any such accommodations are "reasonable" under the ADA. Of course, should it refuse further *reasonable* accommodation as appropriate, it would expose itself once again to ADA liability.

■■■■ The district court finding that "tensions" continued between Quint and her former coworkers presents a different problem. Although Staley's brief below represented that coworker tensions existed, statements by counsel are not competent evidence. *See Fernandez v. Chardon*, 681 F.2d 42, 56 n. 10 (1st Cir.1982) (statements by counsel are no substitute for admissible evidence), *aff'd*, 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983). The record on appeal is devoid of any testimony or other evidence from any current Staley employee that working with Quint would be intolerable. *See Lussier*, 50 F.3d at 1113 (vacating front-pay award and noting that "[i]t is a fundamental principle of our jurisprudence that a factfinder may not consider extra-record evidence concerning disputed adjudicative facts"). Thus, the only suggestion of coworker tensions in the appellate record consists of conclusory assertions by Staley's counsel.

These assertions are infirm for other reasons as well. First, the only clear-cut evidence at trial showed no antagonism among Quint's coworkers in 1993–94. When asked: "Do you remember that a lot

---

18. The following exchange occurred at trial between Quint's counsel and Baker:

Q: So, it wasn't a permanent situation. She might be doing fine one week, and if you increased her job duties, she might be worse, right?

A: Certainly Jackie [Quint] had testified when work she was doing brought on symptoms of carpal tunnel, yes.

Q: And the company would have to respond to that change in her condition, right?

A: That's correct.

Q: You couldn't assume that, once she got better, she was never going to get worse again, right?

A: That is correct.

of coworkers complained about the accommodations being made for Jackie Quint?," coworker Arnold Gonya answered: "No, I don't." On the other hand, Baker testified in vague and tentative terms: "I *believe* there had been some friction with *some* of the workers around how much [Quint] was doing ... some feelings of inequities *perhaps* by her coworkers." (Emphasis added.) Baker neither related any specific coworker complaint nor identified a particular complainant. Saunders testified to having heard *of* complaints, but when asked to confirm complaints by any particular employee, stated: "I can't remember for sure."

Moreover, given the four-year lifespan of the present litigation, it is not even clear that any former coworker is still employed at Staley. Nor can we presume, as Staley does without a shred of evidence, that Quint's forty or more coworkers must be intolerably envious because she won $300,-000 in damages, while they are considerably less well off. The factual assumptions underlying this presumption (*e.g.*, coworkers' empathy for management rather than their coworker) amount to little more than rank speculation.

Finally, we state the obvious. While it may be that Staley's unsubstantiated reference to "coworker tensions" cloaks Staley *management's* antagonism toward Quint, rarely could an ADA claimant be reinstated were any such employer antagonism considered an adequate ground for denying reinstatement, *see Century Broadcasting*, 957 F.2d at 1462, and the legislative aims of the ADA surely would be ill served.

■ We do not state that coworker hostility, *adequately proven real and intolerable*, may not provide an appropriate ground for refusing reinstatement. *See, e.g., Deloach v. Delchamps, Inc.*, 897 F.2d 815, 822 (5th Cir.1990) (determining rein-

statement impracticable where it would cause morale problems and disrupt other individuals' employment). Given the current record and the prominence of the reinstatement remedy under the ADA scheme, however, adequate review of the district court's denial of reinstatement is impracticable.[19]

### III

### *CONCLUSION*

Accordingly, we remand to the district court for such further proceedings as it deems necessary and appropriate to inform the further exercise of its discretion relating to reinstatement. *See Lussier*, 50 F.3d at 1115 (vacating front-pay award due to court's reliance on extra-record evidence, and noting that court on remand may opt between another evidentiary hearing or "hold[ing] the parties to their proof at trial [and] ... the existing record"); *see also Selgas*, 104 F.3d at 15 (vacating reinstatement ruling on same grounds). Should a further evidentiary hearing appear appropriate, the parties should adduce specific evidence relating to the availability of current press-operator positions at Staley, and any current coworker hostility toward Quint which might make reinstatement impracticable.

For the foregoing reasons, *the $300,000 damages award is affirmed; the back-pay award is increased from $8,019 to $45,917; the district court ruling denying reinstatement is vacated and the case is remanded for further proceedings consistent herewith. Costs to appellant.*

*SO ORDERED.*

---

19. Clearly, reinstatement is a threshold issue in any assessment of the denial of front pay. For example, were Staley required to reinstate Quint, the parties might negotiate an agreement whereby Quint would accept a front-pay settlement in lieu of reinstatement. *See Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 258 (5th Cir.1996).